Filed 7/7/11

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S076175 |
| v. | ) | |
| | ) | |
| ELOY LOY, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. NA 029308 |
| _____ | ) | |

A jury convicted defendant Eloy Loy of the first degree murder of Monique Arroyo under the special circumstance of a murder committed while engaged in the commission of a lewd and lascivious act on a child under the age of 14. (Pen. Code, §§ 187, 190.2, subd. (a)(17).) After a penalty trial, the jury returned a verdict of death. The court denied the automatic motion to modify the verdict and sentenced defendant to death. (Pen. Code, § 190.4.) This appeal is automatic. (Pen. Code, § 1239, subd. (b).) We affirm the judgment.

## I. THE FACTS

### A. Guilt Phase

The evidence showed that during the night of May 8-9, 1996,[1] defendant entered the bedroom of his 12-year-old niece, Monique Arroyo, while she was

---

[1] All dates are in the year 1996 unless otherwise indicated.

1

sleeping.  He assaulted her sexually, killed her, and dumped her body in a nearby vacant lot, where it was discovered four days later.

### 1. *Prosecution Evidence*

On the afternoon of May 8, defendant went to the Wilmington home of his sister, Rosalina Arroyo, and her family.  Rosalina's 12-year-old daughter, Monique Arroyo, also lived at that house.  Monique shared an upstairs bedroom with her older sister, Josette.  Previously, defendant had lived at that home for a while.  At this time, however, he was residing with his brother and sister-in-law, Leonard and Maria Loy, who lived about five to 10 miles from the Arroyo home.  Some of the witnesses testified that defendant had not been at the Arroyo house for several weeks before that day, and that he normally was not allowed to go upstairs.

That afternoon, a movie location manager arrived and spoke with Rosalina.  The manager arranged to use the Arroyo house in a movie project.  Monique was to have an opportunity to appear as an extra in the project.  She arrived home from school around 2:45-3:00 p.m., and was excited about the movie opportunity.

Defendant helped Monique's brother, Jose Arroyo, Jr. (Jose), work on a sprinkler system in the front yard.  When they finished, defendant and Jose went out drinking beer, using defendant's car, a red Cadillac.  After various stops, including one where they put about one dollar's worth of gasoline in the tank, all they could afford at the time, they returned to the Arroyo home.  Defendant parked his car on the street.  Initially, Jose, who had become intoxicated, refused to get out of the car.  Defendant pleaded, "Get out.  I have to be at work at six o'clock sharp."  Defendant repeatedly said he had to go to work at 6:00 a.m.  Around this time, Jose saw his brother Gabriel.  Defendant told Gabriel that Jose was drunk and asked for help getting Jose out of the car.  Eventually, defendant, Jose, and

2

Gabriel entered Jose's bedroom on the second floor. Normally, defendant was not permitted to go upstairs. By this time, Jose was "really drunk." He lay down and asked Gabriel and defendant to leave his bedroom. It was around 11:45 p.m. They left and Jose fell asleep. To get downstairs from Jose's bedroom, one has to pass by Monique's bedroom.

Gabriel testified that he went downstairs to his bedroom and defendant went downstairs with him. He thought defendant was leaving the house by the front door, but he did not actually see him leave or hear a door close. Gabriel went to bed around midnight. He looked to see that the doors to the outside were closed. The lights were off in the house. Defendant's car was still in front. Gabriel did not hear it leave.

Josette spent that night at her boyfriend's house, so Monique was alone in her bedroom. Monique had occasionally locked her bedroom door, but she stopped doing so because of Josette's complaints. Around 10:00 p.m., Rosalina told Monique to go to bed. Jose Arroyo, Sr., Monique's father, testified that when he went to bed around 9:30 to 10:00 p.m., Monique was already asleep. Rosalina herself went to bed around 12:20 a.m., May 9. Before she did so, she twice checked on Monique, who was asleep in her bedroom. Monique's bedroom door was not locked. Rosalina testified that Monique was wearing blue shorts and what she described as a "tank top" or a "sweater." Jose, Sr., described Monique's clothing as "jeans and a dark sweater or shirt."

Around 1:00 a.m. that morning, Rosalina was awakened by a creak in the stairway that sounded like "footsteps coming up." She "jumped up," went to her door, and yelled out, "Joey [Jose], Gabe, is that you downstairs?" She listened by the door for about three minutes but heard nothing else. Thinking it might have been her imagination, she went back to sleep. The door to Monique's door was still closed.

The next morning, Monique was missing. Her father awoke around 5:30 a.m. and, around 6:05 to 6:10 a.m., noticed that her bedroom door was open and that she was not in the room. He told Rosalina that Monique was not there but then went to work around 6:30. The side door to the house had an inner and an outer door. When Jose, Sr., left, the inner door was open and the outer door unlocked. Members of the Arroyo family looked for Monique but could not find her. Her brother Jose looked in her bedroom. He observed Monique's sheets on the floor in the middle of the bedroom, as if they had been thrown there. Later, Jose found in Monique's closet on the bottom of a pile of clothes the shirt that Rosalina testified Monique was wearing when she went to bed.

Josette arrived home around 7:20 that morning. She observed a sheet from Monique's bed on the driveway. She went upstairs, where Monique's alarm clock was going "full blast." No sheets were on Monique's bed. Some were on the floor. That morning, Josette called the home where defendant was living. Defendant told her that he had gone straight home after leaving the Arroyo house the night before. Josette testified that she checked and determined that none of Monique's clothes or shoes were missing. There was no sign of a forced entry into the house.

On May 12, Monique's nude body was found in a vacant lot about one-half to three-fourths mile from the Arroyo home. The body was badly decomposed and covered with maggots. It had to be identified by dental records. When found, the body was covered by a comforter that had been on Monique's bed, identical to another comforter belonging to Josette. The comforter was not in Monique's room the morning she was discovered missing.

Leonard Loy, with whom defendant was living at this time, testified that the night before Monique was discovered missing, he went to bed around 11:30 p.m. Defendant was not home. Sometime later, Leonard got up and noticed that

4

defendant was not home then either. Maria Loy testified that at 5:35 a.m. that morning, the alarm clock defendant used to wake up in the morning went off. She waited for someone to turn it off. When no one did so, she turned it off herself. Defendant was not home at the time, and his car was not parked in its usual spot. Maria went back to bed, reawakening shortly before 7:00 a.m. This time defendant was home.

Howard Wilson, who lived about two houses from where defendant was living at the time, testified that around 2:30 a.m. on May 9, he observed defendant driving his red Cadillac. Defendant looked at him and drove by very slowly. Defendant's car turned around and passed by a second time, then a third time. Then Wilson observed defendant walking away from his house.

Dr. Lisa Scheinin performed the autopsy. In her opinion, the cause of death was "asphyxia due to compression of the face and/or the neck and/or the body." She testified that asphyxia is "the most common sex-associated way of killing people." Visually, Dr. Scheinin did not observe any obvious signs of injury to the genitalia, but an injury could not be ruled out because the body was badly decomposed. Microscopically, she found bleeding in various areas of the vagina, which was consistent with sexual penetration. No semen was found on the body or the comforter covering it, but that did not rule out sexual activity.

A criminalist compared fibers taken from the comforter that had covered Monique's body with fibers from the carpet in defendant's car. Twenty fibers from the comforter were similar to carpet fibers from the car "in microscopic characteristics and fiber type, the color, and color variation being the fading of the carpet."

A small bloodstain was found on the inside of the trunk lid of defendant's car. Erin Riley, a serologist, performed deoxyribonucleic acid (DNA) analysis of the bloodstain, using the polymerase chain reaction method. She determined that

5

the bloodstain could have been Monique's blood but not defendant's. One person in about 125,000 would match that blood's DNA profile. Blood found on the comforter was consistent with Monique's blood. The comforter also contained faint DNA markers consistent with defendant's DNA. Defendant's left palm print was found on the outside portion of the doorframe of Monique's bedroom.

David Faulkner, an entomologist, examined maggots collected from the body. Based on the development of the maggots, he could estimate how long they had been associated with the body. In his opinion, they had been associated with the body between 3.5 and 3.7 days, meaning that they were deposited on the body sometime between around 10:00 a.m. to 2:00 p.m. on May 9. Because most insects do not fly at night, the body could have been left in that location the previous night.

Several family members testified about the strained relationship between defendant and Monique. Maria Loy, defendant's sister-in-law, testified that about a month before Monique was discovered missing, defendant spoke with her concerning Monique. He was upset about comments Monique had made about him and told Maria, "But you just wait and see. That little brat, I'll get to her. I don't know how, but I'll get to her."

Sara Minor, Monique's friend, testified that she called Monique on the telephone about a week before she disappeared. Monique said she was afraid of her uncle Eloy because he would "make weird looks at her and sneak up to her room and touch her . . . chest and . . . grab her crotch." Monique told Sara not to tell anyone. When she was saying this, Monique "was crying, but not heavily. You could just hear her holding back tears."

The prosecution presented evidence that in 1975 and again in 1981, defendant was convicted of rape, oral copulation, and sodomy. Both victims testified about the crimes. Ramona M. testified that in March 1975, when she was

6

16 years old, she entered defendant's car. After driving a while, he stopped, locked the car doors, and proceeded to rape and sodomize her and force her to orally copulate him. In the process, he bit her, hit her, kicked her, and choked her with his hand around the front part of her neck. She suffered various injuries. L.S. testified that in November 1980, when she was 32 years old, she went with defendant to his apartment. There, he raped and sodomized her and forced her to orally copulate him. He hit and kicked her and choked her with his hand around the front part of her neck. She suffered broken ribs.

### 2. *Defense Evidence*

Defendant presented his case both by cross-examining prosecution witnesses and by calling his own witnesses. The defense theory of the case was that defendant had nothing to do with Monique's death. Defendant was taken into custody in this matter sometime before 1:00 p.m. on May 9. Defense counsel suggested that Monique might have run away from home the night of May 8-9 and been killed sometime later, after defendant was in custody.

Defendant presented evidence that did not implicate him in the crime. Hair from the comforter and other items did not match defendant's hair. Two pubic hairs from the comforter did not match either Monique's or defendant's hair. No seminal fluid was found on any of the items of evidence. Tire tracks and shoe prints from the scene where the body was found, including shoe prints on the comforter, and metal scrapings from a nearby fence did not match some of defendant's shoes or his car. Defendant's fingerprints were not found inside Monique's bedroom. Other than the bloodstain inside the trunk of defendant's car, no evidence was found on the car or in Monique's bedroom connecting defendant to the crime. Certain foam samples taken from defendant's car did not match foam samples taken from the comforter.

7

Kathleen Ledesma, who had called the police to the scene where the body was found, testified that the vacant lot was not readily accessible due to a high fence surrounding it. She said that when the police arrived, they cut through the fence to gain access to the body. A mechanic testified that defendant's car contained only about a gallon of gasoline. It would get around 10-12 miles per gallon. Peter Barton, who owned a business near the vacant lot where the body was found, testified that over the weekend of May 11 to 12, he saw an "odd car" in the area. Other people were also in the area during this time. Barton noticed no unusual smells that weekend. After the body was found, but not before, he smelled the "smell of death" in the area.

Defendant presented evidence of prior statements of Jose and Gabriel Arroyo. Gabriel had told the police that "he believed [defendant] had exited the front door" the night Monique disappeared.

After Monique was discovered missing, her family showed members of the public a photograph of her. Two witnesses testified that they saw a girl who looked like, or could have been, the girl in that photograph — one at a minimart after midnight the night of May 8-9, and one at a Burger King around 6:00 to 6:30 p.m., May 9.

Dr. Sharon Van Meter reviewed the autopsy report. In her opinion, the body was so badly decomposed that the cause of death could not be determined. She also believed the body contained no physical evidence of a sexual assault.

Defendant elicited testimony on cross-examination of Riley, the serologist, that she tested the bloodstain from defendant's car trunk for seven DNA markers. Monique's blood matched six of the markers. However, because the sample of Monique's blood was degraded, Riley could not confirm that her blood matched the seventh marker. Deleting that marker from the calculation reduced the odds of a random person other than Monique matching that blood sample to one person in

8

5,100. Additionally, Riley testified that the odds "would be lower in related people." She did not test the blood of Monique's relatives.

Sara Minor, Monique's friend, testified on cross-examination about other statements Monique had made to her in other conversations. Monique said some older boys, around 18 or 19 years old, often came to her house late at night trying to get her to come out of the house.

Leonard Loy testified on cross-examination that defendant occasionally would sleep in his car, and that he was required to go outside to smoke.

Defendant also presented evidence concerning the collecting of the maggot samples that David Faulkner examined.

### 3. Other Evidence

On rebuttal, a police officer testified that a gap between two fence poles permitted access by foot onto the lot where the body was found. Another pathologist reviewed the autopsy report and disagreed with some of Dr. Van Meter's conclusions. Kathleen Ledesma testified that she had smelled an odor in the area for about three days before the body was found.

On surrebuttal, defendant elicited a stipulation that Ledesma had told the police that she had noticed a strange smell on May 11, but thought nothing of it.

### B. Penalty Phase

#### 1. Prosecution Evidence

Monique's parents testified about Monique's life and the impact her disappearance and death had on them and the rest of her family.

Gloria M., Ramona M.'s sister, testified further about the 1975 incident in which defendant sexually assaulted Ramona. When Ramona did not return from her drive with defendant, the 19-year-old Gloria went out looking for her. At one point, defendant drove beside her and asked her to enter his car, saying, "You need

to get in because if not, you're never gonna see your sister again." When she entered the car, defendant drove her to a field, then told her she would not see her sister again because he had killed her. He tried to grab her, but she "opened the door and . . . rolled out of the car." She got up and ran. Defendant drove towards her and tried to entice her back into the car, but she managed to escape.

The prosecution presented evidence that defendant was convicted of attempted burglary in 1972.

### 2. *Defense Evidence*

One of defendant's brothers, Leonard Loy, two of his sisters, Beatrice Montiel and Angela Hernandez, and a niece, Crita Stiles (Angela Hernandez's daughter), testified about defendant's troubled life, his prison history, his good qualities, and their positive feelings about him.

Yolanda Cabrera, defendant's friend and one of the persons defendant and Jose visited when they went drinking the night Monique disappeared, testified that defendant came to her home around 11:30 p.m. that evening. It appeared he "had had a little to drink." He asked if he and his nephew could come in. She objected because it was late and he had been drinking. He apologized and left. About a half-hour later, defendant called her on the telephone and apologized again.

Anthony Casas, a former associate warden at San Quentin State Prison, testified regarding prison conditions and prison gangs. Once, while an associate warden at the California Men's Colony in San Luis Obispo, he made a movie about prison gangs that was intended to discourage inmates from joining them. Defendant, an inmate at the prison at the time, volunteered to participate. He was chosen to play the "main protagonist" because he appeared vulnerable. Defendant and the other inmates in the film did an "outstanding job" despite the difficulties and dangers inherent in the project.

10

## II. DISCUSSION

### A. Comments to Prospective Jurors During Jury Selection

During jury selection, the prosecutor asked the court to explain the nature of the penalty phase to the prospective jurors. She was concerned that the juror questionnaires contained questions regarding the death penalty. She explained, "A lot of times they answer the questions without a real basis or understanding of the system. And, then, we like to lock them in and we're unforgiving." The court asked the parties to try to agree informally on what it should tell the prospective jury members.

Later, the court explained the basic nature of the trial to the first panel of prospective jurors. It said that if, and only if, the jury found defendant guilty of murder with special circumstances, the trial would go to a penalty phase. It told the jury it would "tell you a little bit about the death penalty history of it just so you understand. Because some of you probably read a lot about it, talked about it, some of you haven't at all, and some of you may be a little of this here and there." It then discussed the recent history of the death penalty in California. It said that a prior law had been invalidated, and that some people "no longer had the death penalty." It then explained that the 1978 law "was tested, and it took a number of years for testing, to go up and down the appellate ladder, California Supreme Court, U.S. Supreme Court, and so forth, and [was] found constitutional. [¶] So a number of people have been convicted under that new law, and there are a number of people on death row in California right now, as well as other states in the United States."

The court explained that if the case went to a penalty phase, "there are just two options for the jury to choose, death penalty or life without possibility of parole. You are instructed now that those two sentences and what I just said are

11

meaningful and that's what they mean.  That's what the person would get.  [¶] The reason I said that is that some people have different ideas of what happens and when it happens.  It's true that sometimes people have their appeals going for a long period of time; but you also know that it's also true that after those appeals, certain things have happened in California and around the United States on this issue insofar as executions being carried out."  The court also explained that "in a capital case the difference between that and another case which isn't a capital case is that the jury decides death penalty or life without possibility of parole if the defendant is convicted.  [¶]  . . .  [¶] You would consider everything that you are entitled to consider, and you would be told what you can consider at the end of the case.  And then you would make your decision based upon the additional information that was submitted to you."

The court made comparable comments to the second and final panel of prospective jurors.

Defendant contends that these comments violated the rule "that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."  (*Caldwell v. Mississippi* (1985) 472 U.S. 320, 328-329.)  Although he did not object to the comments at trial, the contention is cognizable because the trial predated the finality of our decision in *People v. Cleveland* (2004) 32 Cal.4th 704, 762.  (See *People v. Moon* (2005) 37 Cal.4th 1, 17-18.)  The contention, however, lacks merit.

Defendant claims the court's statement that the prior death penalty had been invalidated and a number of people "no longer had the death penalty" reduced the jury's sense of responsibility.  We disagree.  The court also stated unequivocally that the current death penalty law had been held valid.  Defendant also challenges

12

the court's reference to the appellate process. Although mention of the appellate process is usually unnecessary and inadvisable, it is generally known that there is an appeal from a judgment of death. "Certainly the mere mention of the appellate process, while ill-advised, does not — standing alone — necessarily constitute reversible *Caldwell* error." (*People v. Moon*, *supra*, 37 Cal.4th at p. 18.)

In deciding whether *Caldwell* error occurred, we do not consider the challenged statements in isolation but in the context in which they occurred. (*People v. Hinton* (2006) 37 Cal.4th 839, 905.) Moreover, "*Caldwell* is relevant only to certain types of comment — those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." (*Darden v. Wainwright* (1986) 477 U.S. 168, 183, fn. 15; see *People v. Harris* (2005) 37 Cal.4th 310, 356.)

Viewing the comments in context, they did not mislead the jury or diminish its sense of responsibility. They were made during jury selection to explain the basic process to prospective jurors, not during the penalty phase itself when the jury's sentencing responsibility was the main focus. (*People v. Morris* (1991) 53 Cal.3d 152, 182.) At the penalty phase, the court instructed the jury that it "should assume in your deliberations and decision that life without possibility of parole means the defendant will be in prison for the rest of his life, and the death sentence means the defendant would be executed"; and that "[i]t will be your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, should be imposed on the defendant." These instructions made clear it was the *jury's* responsibility to determine the appropriate sentence. We see no reasonable likelihood the court's mention of appellate review during jury selection reduced the jury's sense of responsibility for its verdict. (*People v. Hinton*, *supra*, 37 Cal.4th at p. 906; *People v. Mendoza* (2000) 24 Cal.4th 130, 186-187.)

13

**B. Admission of "Other Crimes" Evidence**

Before trial began, the prosecutor moved to admit under Evidence Code section 1108 (section 1108) evidence of defendant's sexual assaults on Ramona M. and L.S. Defendant filed an opposition and the prosecutor a reply to that opposition. The matter was heard at trial. After hearing argument, the court admitted the evidence. It found that the evidence would not "mislead the jury," "confuse the issues," or "necessitate undue consumption of time," and that it was not unduly prejudicial.

Thereafter, Ramona M. and L.S. testified about the sexual assaults. Before they testified, and again at the end of the guilt phase, the court instructed the jury on the use it could make of this evidence. (See pt. II. E., *post*.)

Defendant contends the court erred in admitting the evidence. We disagree.

Section 1108, enacted in 1995, provides in subdivision (a), "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] Section 1101, if the evidence is not inadmissible pursuant to Section 352." (See generally *People v. Falsetta* (1999) 21 Cal.4th 903.) Defendant does not dispute that section 1108 applies to this case. The prior assaults, both involving rape, sodomy, and oral copulation, were clearly sexual offenses. Moreover, defendant was charged with murder during the commission of a lewd and lascivious act on a child under the age of 14. Section 1108, subdivision (d)(1), defines "sexual offense" as including a crime that involves any conduct proscribed by Penal Code section 288, the statute that proscribes a lewd and lascivious act on a child under the age of 14. Hence, defendant was accused of a sexual offense under section 1108. (See *People v. Story* (2009) 45 Cal.4th 1282, 1290-1291.)

14

Defendant contends, however, that section 1108 is unconstitutional. We found it constitutional in *People v. Falsetta*, *supra*, 21 Cal.4th at pages 910-922. Defendant asks us to reconsider this decision but provides no good reason to do so. Indeed, the Ninth Circuit Court of Appeals has since held constitutional a similar federal rule. (*U.S. v. LeMay* (9th Cir. 2001) 260 F.3d 1018, 1024-1027 [upholding Fed. Rules Evid., rule 414, 28 U.S.C.]) We adhere to *Falsetta*.

Defendant also contends the court erred by not excluding the evidence under Evidence Code section 352, which gives the trial court discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue time consumption or create substantial danger of undue prejudice, confusing the issues, or misleading the jury. In exercising this discretion as to a sexual offense, "trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*People v. Falsetta*, *supra*, 21 Cal.4th at p. 917.) The court's ruling under section 1108 is subject to review for abuse of discretion. (*People v. Story*, *supra*, 45 Cal.4th at p. 1295.) We see no abuse of discretion. Indeed, little reason existed to exclude the evidence.

Defendant had been convicted of both previous assaults, which strongly supports their admission. His commission of those crimes had already been established and was thus certain, and defendant bore no new burden of defending against the charge. The jury would not be tempted to convict him of the charged

crime to punish him for the earlier crimes.  (*People v. Balcom* (1994) 7 Cal.4th 414, 427.)  Additionally, the convictions meant there was little danger of confusing the issues or requiring an inefficient mini-trial to determine defendant's guilt of the previous crimes.  (See *People v. Falsetta*, *supra*, 21 Cal.4th at p. 916.)  The evidence was presented quickly, with only the victim of each assault testifying.  Indeed, the prosecution presented additional evidence regarding one of the assaults only at the penalty phase.

Defendant argues that admission of the evidence distracted the jurors from their main inquiry.  We disagree.  The Legislature has determined that this evidence is " 'particularly probative' " in sex cases.  (*People v. Story*, *supra*, 45 Cal.4th at p. 1293.)  The main inquiries in this case were whether defendant was the person who killed Monique, and whether he did so while committing a lewd and lascivious act.  Rather than distracting the jury, this evidence *assisted* it in these inquiries.  "The central issue in these cases commonly involves not just whether the conduct took place as the victim described it, but whether the defendant was the one who perpetrated it.  Section 1108 assists the jury's task by allowing the accused's sexual misconduct history to be considered for whatever light it might shed on these issues, including a defendant's claim of mistaken identity."  (*People v. Britt* (2002) 104 Cal.App.4th 500, 506.)  Here, Monique, the victim, was unable to describe the conduct that lead to her death.  But, if anything, this circumstance makes the evidence all the more necessary.  "The necessity for admitting this particularly probative evidence that exists when the alleged victim's credibility might be questioned can be no greater than the necessity that exists when the victim was *killed* and thus cannot even tell her story."  (*People v. Story*, *supra*, at p. 1293.)

Defendant argues the evidence was substantially more prejudicial than probative, thus compelling its exclusion.  The trial court acted within its discretion

16

in concluding otherwise. Evidence of previous criminal history inevitably has some prejudicial effect. But under section 1108, this circumstance alone is no reason to exclude it. "[S]ection 1108 affects the practical operation of [Evidence Code] section 352 balancing ' "because admission and consideration of evidence of other sexual offenses to show character or disposition would be no longer treated as intrinsically prejudicial or impermissible. Hence, evidence offered under [section] 1108 could not be excluded on the basis of [section] 352 unless 'the probability that its admission will . . . create substantial danger of undue prejudice' . . . substantially outweighed its probative value concerning the defendant's disposition to commit the sexual offense or offenses with which he is charged and other matters relevant to the determination of the charge. As with other forms of relevant evidence that are not subject to any exclusionary principle, *the presumption will be in favor of admission.*" ' (Historical Note, 29B pt. 3, West's Ann. Evid. Code [(1998 pocket supp.)] foll. § 1108, p. 31.)" (*People v. Soto* (1998) 64 Cal.App.4th 966, 984, italics added.)

Nothing about the evidence here required the trial court to find the presumption in favor of admissibility had been overcome. The facts of the previous offenses, although unpleasant, were not particularly inflammatory compared to the horrendous crime of this case. The evidence was presented quickly and without irrelevant detail. Judging from the dates alone, the 1975 and 1981 crimes were somewhat remote from the charged 1996 crime, a factor that, although not itself dispositive, would normally weigh against admission. But defendant had been in prison, and thus had little or no opportunity to commit sexual crimes, for much of the time between the 1975 and 1981 crimes, and again between the 1981 crimes and the charged crime. Thus, the timing of the crimes provided no reason to exclude them.

Defendant cites the trial court's exercise of discretion in excluding other evidence the prosecutor had proffered as a reason why it also had to exclude this evidence. The prosecution had sought to admit evidence that defendant sometimes flirted with women much younger than he, although older than Monique was when she died. After a hearing, the court excluded the evidence, finding it more prejudicial than probative. Nothing about the court's exclusion of evidence of *flirting* compelled it to exclude evidence of sexual *offenses* under section 1108. Rather than being inconsistent, the court's rulings show it carefully exercised its discretion.

Defendant claims the court had to exclude evidence of the previous crimes because "they bore no similarity to the capital case." Even if true, this circumstance, although relevant to the trial court's exercise of discretion, is not dispositive. Before section 1108 was enacted, Evidence Code section 1101 governed the admission of prior criminal conduct, and a body of law developed concerning how similar the prior conduct had to be to the charged crime; the required degree of similarity varied depending on the use for which the evidence was offered. (See generally *People v. Ewoldt* (1994) 7 Cal.4th 380.) "All of that radically changed with respect to sex crime prosecutions with the advent of section 1108. . . . [S]ection 1108 now 'permit[s] the jury in sex offense . . . cases to consider evidence of prior offenses *for any relevant purpose*' (*People v. James* (2000) 81 Cal.App.4th 1343, 1353, fn. 7, italics added), subject only to the prejudicial effect versus probative value weighing process required by [Evidence Code] section 352." (*People v. Britt*, *supra*, 104 Cal.App.4th at p. 505.) "In enacting Evidence Code section 1108, the Legislature decided evidence of uncharged sexual offenses is so uniquely probative in sex crimes prosecutions it is presumed admissible without regard to the limitations of Evidence Code section 1101." (*People v. Yovanov* (1999) 69 Cal.App.4th 392, 405.) Or, as another court

18

put it, "[t]he charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise Evidence Code section 1108 would serve no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in section 1108." (*People v. Frazier* (2001) 89 Cal.App.4th 30, 40-41.)

Although the previous sexual offenses may not have been sufficiently similar to be admissible under Evidence Code section 1101, they were not entirely dissimilar. Ramona M. was only four years older when defendant assaulted her than Monique was when she died. Defendant choked both of his previous victims. Because Monique's body decomposed in a vacant lot for several days, exactly how she was sexually assaulted and how she died could not be determined forensically. But it appears she died by asphyxiation which, Dr. Scheinin testified, is the most common means of killing in cases of sexual assault. Thus, evidence of the choking was highly relevant, weighing in favor of admission.

Defendant complains the evidence bolstered an otherwise weak prosecution case. We disagree that the prosecution case was weak. The overall evidence of guilt was reasonably strong. But even if defendant were correct, the argument would not aid him. The supposed weakness of the rest of the case would be relevant to the question of prejudice if there were error, but it provides no reason to exclude this particularly probative evidence. Evidence of previous sexual offenses is relevant on the question of identity. (*People v. Britt*, *supra*, 104 Cal.App.4th at p. 506.) This remains true whatever the strength of the rest of the evidence.

Defendant relies heavily on two decisions. In one, *People v. Abilez* (2007) 41 Cal.4th 472, 501-502, we found no abuse of discretion in the trial court's exclusion of certain evidence under section 1108. That decision does not aid defendant. Because of the "broad discretion" trial courts have under section 1108

19

(*People v. Falsetta*, *supra*, 21 Cal.4th at p. 919), a finding of no abuse of discretion in one court's exclusion of evidence has no bearing on whether a different court abused its discretion in admitting evidence in a different trial.

Defendant also cites *People v. Harris* (1998) 60 Cal.App.4th 727, where the Court of Appeal found an abuse of discretion in admitting evidence under section 1108. But *Harris*'s facts were entirely different from those here. There, the prior offense was forcible and the evidence of it was "inflammatory *in the extreme*." (*Id*. at p. 738.) The charged sexual offenses were, by contrast, not forcible but involved breaches of trust. Thus the charged offenses were "of a significantly different nature and quality than the violent and perverse attack on a stranger that was described to the jury." (*Ibid*.) Moreover, "[t]he facts of the prior conduct were redacted to a point that the jury must have come away with a misleading impression of what happened . . . ." (*Id*. at p. 733.) The prior offense occurred 23 years before the charged offenses, a factor the Court of Appeal found weighed in favor of exclusion. (*Id*. at p. 739.) Those circumstances do not exist here. Nothing in *Harris* compels the conclusion that the court abused its discretion in admitting the evidence here.

## C. Admission of Victim's Statement

Defendant contends the court erred in admitting Sara Minor's testimony that Monique told her approximately one week before she disappeared about defendant's touching her. Defendant objected to the testimony on hearsay grounds and under Evidence Code section 352, and the court held a hearing outside the jury's presence. The prosecutor made an offer of proof and argued the testimony was admissible as a spontaneous statement under Evidence Code section 1240 and as a fresh complaint. After reviewing the case law, the court admitted the evidence. At defendant's request, it also ruled that if the prosecutor admitted the

20

statements concerning defendant, defendant could elicit other statements Monique had made to Sara regarding older boys coming to the house. Defendant did elicit those statements.

The Attorney General argues, as did the prosecutor at trial, that the statement was admissible both as a spontaneous statement under Evidence Code section 1240 and under the fresh complaint doctrine as discussed in *People v. Brown* (1994) 8 Cal.4th 746. The second of these arguments clearly lacks merit. *Brown* held that evidence of a fresh complaint can sometimes be admitted for a relevant *nonhearsay* purpose. (*Id*. at pp. 749-750.) It is not readily apparent what relevant nonhearsay purpose for the statement existed here. In any event, Sara's testimony was not admitted for a nonhearsay purpose, but for the truth of the matter asserted — to show that what Monique described actually occurred. The court so instructed the jury.[2] To be admissible for its truth, the statement must come within an exception to the hearsay rule. (*People v. Brown, supra*, at p. 749, fn. 1.) The only exception that may apply here is that for spontaneous statements.

Evidence Code section 1240 excepts from the hearsay rule a statement that "(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." Monique's statements concerning defendant clearly satisfied requirement (a). They described events that

---

[2]    The court instructed: "Evidence has been introduced *for the purpose of showing* [*a*] *lewd or lascivious act* between the defendant and the alleged victim on another occasion other than that charged in the case. [¶] If you believe this evidence, you may use it for the limited purpose only of tending to show the defendant's lewd disposition or intent towards the child. You must not consider the evidence for any other purpose." (Italics added; see CALJIC No. 10.43.)

21

she perceived. Defendant contends, however, that requirement (b) was not satisfied because the statements were not spontaneous.

To be admitted under this exception, " ' "(1) there must be some occurrence startling enough to produce . . . nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." ' [Citations.] We review the trial court's ruling admitting statements as spontaneous for abuse of discretion." (*People v. Lynch* (2010) 50 Cal.4th 693, 751-752.)

The second of these requirements is the one most at issue here. Some time had elapsed between the act Monique described and Sara's telephone call, although how much is not known. It is not clear that Monique's reflective powers were still in abeyance and that she had no time to contrive or misrepresent. (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 808-812.) Rather than decide this difficult question, we will assume the court erred in admitting Sara's testimony.

Defendant contends the error also violated his right to confront witnesses under the Sixth Amendment to the United States Constitution. Although he did not specifically invoke the federal Constitution at trial, he may raise this contention on appeal to the extent he argues that the erroneous overruling of the objection actually made also had the consequence of violating his federal confrontation rights. (*People v. Gutierrez*, *supra*, 45 Cal.4th at p. 809.)[3] But the contention lacks merit.

_____

[3] In *People v. Redd* (2010) 48 Cal.4th 691, 730, we held that an objection on the ground of lack of foundation for a hearsay exception did not preserve an argument that admitting the evidence violated the defendant's Sixth Amendment

*(footnote continued on next page)*

"Not all erroneous admissions of hearsay violate the confrontation clause. . . . Only the admission of *testimonial* hearsay statements violates the confrontation clause . . . ." (*People v. Gutierrez, supra*, 45 Cal.4th at p. 812, italics added; see also *Michigan v. Bryant* (2011) 562 U.S. __, __ [131 S.Ct. 1143, 1153].) We held in *Gutierrez* that the statement in that case was not testimonial. "The court [in *Crawford v. Washington* (2004) 541 U.S. 36] explained that the confrontation clause addressed the specific concern of '[a]n accuser who makes a formal statement to government officers' because that person 'bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.' (*Id*. at p. 51.) The statement of a three-year-old declarant made to his aunt is more like a 'casual remark to an acquaintance' and is therefore not a testimonial statement under *Crawford*. (See *People v. Griffin* (2004) 33 Cal.4th 536, 579, fn. 19 [out-of-court statement made to a friend at school does not constitute 'testimonial hearsay' under *Crawford*].) Thus, admission of the child's hearsay statement did not violate defendant's Sixth Amendment right to confront witnesses." (*People v. Gutierrez, supra*, at pp. 812-813.)

The same is true here. Monique's statement to Sara was not testimonial for these purposes. (See also *Michigan v. Bryant, supra*, 562 U.S. __ [131 S.Ct. 1143] [statements of mortally wounded shooting victim to police not testimonial for

---

*(footnote continued from previous page)*

confrontation rights. That holding is consistent with our holding here. In *Redd*, we found no error in overruling the objection actually made. We additionally held that the defendant could not argue the evidence should have been excluded for a reason not asserted below, i.e., that the evidence should have been excluded due to the confrontation clause. Here, we have found the court did err in overruling the objection actually made. Accordingly, defendant may argue that the error also had the consequence of violating his federal confrontation rights.

confrontation clause purposes].)  Admitting the statement did not violate defendant's right to confront witnesses.

Because there was no federal constitutional error, we analyze state law error "under the test articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 to 'evaluate whether "it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error." ' " (*People v. Gutierrez*, *supra*, 45 Cal.4th at p. 813.)  We conclude the assumed error was harmless under this test.

Sara's testimony was a small part of the prosecution case.  Aside from her testimony, much evidence placed defendant inside the Arroyo house the very night Monique disappeared.  He had a false alibi — his statement to Josette that he went straight home after leaving the Arroyo house — and a motive — his bad relationship with Monique and his threat, expressed to Maria Loy, that he would "get to her."  Other evidence strongly connected defendant to the murder.  Additionally, the court instructed the jury that it could consider the evidence only as tending to show defendant's lewd disposition or intent towards Monique.  But the properly admitted evidence clearly showed that whoever committed the murder, and especially if it was defendant, did so with a lewd and lascivious intent.  The body was found nude in a vacant lot.  Defendant's history of sexual assaults shows his lewd and lascivious intent far more strongly than Sara's rather vague testimony.

Moreover, if Sara's testimony for the prosecution was not admissible, the testimony defendant elicited from her concerning boys coming to Monique's house at night trying to get her to come out would also not have been admissible.  If anything, the evidence of spontaneity was even weaker for the statements defendant elicited.  But Sara's testimony was the only evidence defendant could point to that suggested a reason Monique would have left the house of her own

accord the night she disappeared, which was defendant's theory of the case. Had Sara not testified, the defense case would have been even weaker than it was. Thus, it is not clear which side Sara's testimony helped the most. For all of these reasons, it is not reasonably probable the result would have been different had Sara not testified at all.

### D. Admission of Expert Testimony

David Faulkner, the entomologist, testified as an expert regarding how long the maggots collected from Monique's body had been associated with the body. He testified (1) they had been associated with the body for about between 3.5 and 3.7 days, and (2) they had been deposited on the body sometime between around 10:00 a.m. and 2:00 p.m. on May 9. The second of these conclusions was based on his information regarding when the maggots were collected from the body.

Faulkner testified regarding two different samples of maggots that were supplied to him. When the prosecutor asked him to give the dates the samples were collected from the body, defendant objected on the basis of no foundation. The court asked the witness whether he had enough information to answer the question. When the witness said he did, the court overruled the objection. Faulkner then testified that he believed one sample had been collected on May 13 and the other on May 14.

Dr. Scheinin had testified that she collected one of the samples between 9:00 a.m. and noon on May 14, when she performed the autopsy. But the prosecution never established when the other sample had been collected. On cross-examination, Faulkner said he had received a letter from the medical examiner's office saying the samples had been collected on May 13 and May 14. Defendant called as a witness Gary Kellerman, an investigator with the coroner's office, who testified that he had been called to examine the body but he did not

collect any of the maggots.  An unknown person, not Kellerman, had written the date May 13 on one of the jars.  Kellerman testified that he did not use the label form on that jar, but it was standard procedure for the "evidence people" to label a jar that way.  As part of the defense case, the parties stipulated that another employee of the coroner's office also did not collect the samples or fill out the label on the jar.

Defendant contends the court erred in overruling his lack-of-foundation objection regarding the sample supposedly collected on May 13.  We agree.  The prosecution never established the foundational fact that that sample had been collected on May 13 (or, indeed, that it came from Monique's body, although defendant never questioned that fact).  Faulkner's testimony that the sample was collected on May 13 — as well as his resultant conclusion that the maggots were deposited on the body on May 9 — was based on hearsay.

The Attorney General argues that Faulkner properly relied on this hearsay in forming his opinion.  "Expert testimony may also be premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions.  [Citations.] Of course, any material that forms the basis of an expert's opinion testimony must be reliable." (*People v. Gardeley* (1996) 14 Cal.4th 605, 618.)  Faulkner's testimony regarding the date the samples were collected does not come within this rule.

We must examine exactly what *expert* testimony Faulkner was providing. "Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " (*People v. Gardeley*, *supra*, 14 Cal.4th at p. 617.)  How long the maggots had been associated with the body was clearly a subject sufficiently beyond common experience that expert

26

opinion would assist the jury. Faulkner could give his opinion regarding how long the maggots had been on the body and, no doubt, could also assist the jury with calculating back from the time the maggots had been collected, if the time of collection were otherwise established. But *when* the sample was collected was a simple question of fact that the jury could decide for itself without expert guidance. Similarly, an expert could give an opinion that two fingerprint samples were from the same person but, unless that expert had also collected the fingerprints, could not additionally testify where they came from. For example, the expert could not testify that the defendant had left the fingerprints at the crime scene. Or a serologist could testify that a bloodstain sample was consistent with another blood sample, but could not additionally testify about where the bloodstain had been found. These foundational facts were for others to establish.

Accordingly, the court should have required the prosecution to establish that the sample in question had been collected on May 13. It erred in overruling defendant's objection. As noted, we analyze state law error under the *Watson* reasonable probability test. (*People v. Watson*, *supra*, 46 Cal.2d 818.) Defendant contends, however, that the error also violated his right to confront witnesses under the Sixth Amendment to the United States Constitution.

The Attorney General responds first that defendant forfeited his federal constitutional claim by not specifically asserting it at trial. We disagree for the reasons discussed above regarding Sara Minor's testimony. (Pt. II. C., *ante*.) Defendant may argue that the erroneous overruling of the objection also violated his federal confrontation rights. (See *People v. Gutierrez*, *supra*, 45 Cal.4th at p. 809.) On the merits, it appears that overruling the objection did violate defendant's federal constitutional right to confront witnesses. (See *Bullcoming v. New Mexico* (June 23, 2011, No 09-10876) __ U.S. __ [2011 U.S. Lexis 4790].) We will assume it did do so.

27

"Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24." (*People v. Geier* (2077) 41 Cal.4th 555, 608.) We ask whether it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error. (*Ibid*.) For several reasons, the error was harmless under this test.

Faulkner analyzed two different samples of maggots. Dr. Scheinin's testimony established that one of the samples was in fact collected on May 14, the day she performed the autopsy. Faulkner's opinion was mainly based on the sample he believed was collected on May 13, which would have been the earlier of the two. His estimate that the maggots had been associated with the body for 3.5 to 3.7 days, and his calculation back to arrive at the May 9 date as being when they were deposited, were based on the assumed May 13 sample. But presumably, the condition of the maggots collected on May 14 was consistent with this opinion. At least, the jury would have no reason to suppose otherwise. Defendant could have cross-examined Faulkner regarding any differences in the two samples that would cast doubt on Faulkner's opinion, or presented his own expert to question Faulkner's opinion. He did neither.

Additionally, Faulkner's testimony was substantially impeached and in some respects might have aided defendant. On cross-examination, defense counsel elicited that Faulkner's original report had been different from his trial testimony. The original report contained the estimate of May 9 as the date the maggots were deposited on the body. But it also inconsistently estimated that the maggots had been associated with the body for 2.5 to 2.7 days, not the 3.5 to 3.7 days to which Faulkner testified. The 2.5-to-2.7-day estimate would have made the date the body was left at the scene May 10, a time when defendant was apparently already in custody. Thus, that estimate actually aided defendant. Faulkner testified that conversations with another expert, and the fact that both

28

sides had subpoenaed him to testify, led him to discover that his original estimate of 2.5 to 2.7 days was a miscalculation. Shortly before trial, he recalculated his time estimate and prepared a new report that was consistent with his trial testimony. In light of these facts, defense counsel was able to imply that Faulkner changed his calculations to aid the prosecution, although Faulkner testified that he simply corrected his original miscalculation and that his second report, unlike his first, was internally consistent. Under these circumstances, it is not clear how much weight the jury would have given to the May 9 estimate, and how much to the original calculation of 2.5 to 2.7 days that would have aided defendant.

More fundamentally, Faulkner's testimony was not particularly important to the prosecution case. If he had not testified at all, that would simply have meant there was no scientific evidence regarding when the body was placed in the vacant lot. But such evidence was not critical for the prosecution. Without Faulkner's testimony, the jury would have heard that Monique disappeared the night of May 8-9, and her body was found four days later on May 13. It would also have heard that when found the body was badly decomposed — so badly that it could not even be identified visually as Monique's body; it took dental records to make the identification. This meant the body had been there for quite some time. The jury would have had no reason to doubt that the body had been there since the night of May 8-9.

Other evidence compellingly showed that Monique had been taken forcibly from her bedroom the night she disappeared. Her body was covered with a comforter taken from her bed. It was nude and, her sister testified, none of her clothes or shoes were missing. A sheet from her bed was found on the Arroyo driveway and other sheets were found in the middle of her bedroom floor as if they had been thrown there. The clothes she was wearing when she went to bed were found in her closet under a pile of other clothes. Her alarm clock was

29

sounding when Josette entered the bedroom the morning Monique was discovered to be missing. All this evidence shows that Monique left her bedroom involuntarily, not that she ran away on her own, as the defense suggested.

The absence of scientific testimony regarding the time that the body was left in the vacant lot would not have weakened any of this evidence or caused the jury to doubt that the body had been there since the night of May 8-9. The error in overruling defendant's lack-of-foundation objection was harmless beyond a reasonable doubt.

### E. Instructions Regarding the Other Crimes Evidence

The court gave this instruction at the close of evidence in the guilt phase: "If you find the defendant committed a prior sexual offense or sexual offenses, you may, but are not required to, infer that the defendant had a disposition to commit the same or a similar type sexual offense. If you find that the defendant had this disposition, you may, but are not required to, infer he was likely to commit *and did commit* the crime of which he's accused." (Italics added; see CALJIC No. 2.50.01 (6th ed. 1996).) It gave a similar instruction just before the prosecution introduced the testimony of Ramona M. and L.S. The court also instructed at the close of the evidence that the prosecution bore the burden of proving by a preponderance of the evidence that defendant had committed the prior sexual offense and told the jury not to "consider the evidence for any purpose unless you find by a preponderance of the evidence" that defendant had committed it. (See CALJIC No. 2.50.1 (6th ed. 1996).) The court did not further define "preponderance of the evidence."

Defendant contends these instructions were erroneous in three respects. His main contention is that the 1996 version of CALJIC No. 2.50.01, including especially the language "and did commit," erroneously told the jury it could

30

convict him of Monique's murder based *solely* on the evidence of his previous sexual crimes. This error, he argues, violated the constitutional requirement that the prosecution must prove its case beyond a reasonable doubt. The prosecution does, indeed, have to prove all necessary elements of the crime beyond a reasonable doubt. (*Victor v. Nebraska* (1994) 511 U.S. 1, 5; *In re Winship* (1970) 397 U.S. 358, 364.) As a matter of logic, evidence that a defendant committed a prior sexual crime, standing alone and supported by no evidence connecting the defendant to the charged crime, can never constitute proof beyond a reasonable doubt that the defendant committed the charged crime. Accordingly, an obvious specific application of the general rule requiring proof beyond a reasonable doubt is that a jury may not convict the defendant based solely on evidence of a prior sexual crime. (See *People v. Reliford* (2003) 29 Cal.4th 1007, 1013 (*Reliford*); *People v. Falsetta*, *supra*, 21 Cal.4th at pp. 920, 923.) But, as we explain, the jury instructions as a whole did not violate this constitutional requirement.

In *Reliford*, *supra*, 29 Cal.4th 1007, we rejected a similar challenge to an instruction that contained substantially the same language from CALJIC No. 2.50.01 that the court here used, including the language "and did commit." But the overall instruction in *Reliford* differed from the one given here in a significant respect. The *Reliford* instruction included a sentence added in a 1999 revision to CALJIC No. 2.50.01 that postdated the trial of this case. Specifically, the challenged instruction in *Reliford*, but not the one here, was followed by this sentence: " '[I]f you find by a preponderance of the evidence that the defendant committed a prior sexual offense . . . , that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crime.' " (*Reliford*, *supra*, at p. 1013; see CALJIC No. 2.50.01 (1999 rev.) (6th ed. pocket pt.).) We must decide, therefore, whether the sentence added to the standard instruction in 1999 admonishing the jury that evidence of the prior sexual offense is not

31

sufficient by itself to convict was critical; that is, whether the instruction was constitutionally deficient without it.

Cases predating *Reliford*, *supra*, 29 Cal.4th 1007, that involved the pre-1999 version of the standard instruction, i.e., cases on point here, divided badly on this question. The cases arose in two different but functionally identical situations. Some involved evidence admitted under Evidence Code section 1108 and instructions similar to the one given here. Others involved equivalent instructions concerning evidence of domestic violence admitted under Evidence Code section 1109. (See CALJIC No. 2.50.02 (6th ed. 1997).) "Because there is no material difference between CALJIC No. 2.50.01 and 2.50.02, cases decided with respect to these instructions are — at least for present purposes — interchangeable." (*People v. Escobar* (2000) 82 Cal.App.4th 1085, 1097, fn. 7.)

Some of the cases have found instructions similar to the one given here unconstitutional. (*People v. Frazier*, *supra*, 89 Cal.App.4th at pp. 34-40 [CALJIC No. 2.50.01]; *People v. Younger* (2000) 84 Cal.App.4th 1360, 1379-1385 [CALJIC No. 2.50.02]; *People v. James*, *supra*, 81 Cal.App.4th at pp. 1349-1365 [error, but harmless, to give CALJIC No. 2.50.02]; *People v. Orellano* (2000) 79 Cal.App.4th 179, 184-186 [CALJIC No. 2.50.01]; *People v. Vichroy* (1999) 76 Cal.App.4th 92, 98-101 [CALJIC No. 2.50.01]; *Gibson v. Ortiz* (9th Cir. 2004) 387 F.3d 812, 820-825 [CALJIC No. 2.50.01].)

*People v. Orellano* provides a typical explanation. It noted that the trial court had also instructed the jury that it could not consider the evidence of the prior sexual offense for any purpose unless the jury found by a preponderance of the evidence that the defendant had committed the offense, and that the court had defined what preponderance of the evidence means. (*People v. Orellano*, *supra*, 79 Cal.App.4th at p. 183 [citing CALJIC Nos. 2.50.1 and 2.50.2].) The court then explained: "In combination, CALJIC Nos. 2.50.01 (pre-1999), 2.50.1, and 2.50.2

32

permitted the jury to find by a preponderance of evidence that appellant committed the prior crimes, to infer from such commission of the prior crimes that appellant had a disposition to commit such crimes, and to infer from such disposition that appellant 'did commit' the charged crimes, without necessarily being convinced beyond a reasonable doubt that appellant committed the charged crimes. If the jury followed these instructions literally and arrived at a guilty verdict in that manner, appellant was denied his due process right to require proof beyond a reasonable doubt of every fact necessary to constitute the charged crimes. [Citations.] A 'constitutional infirmity arises' because taken literally these instructions authorized a conviction of the current charges based 'solely' upon a finding that appellant committed the prior crimes. (*People v. Vichroy*, *supra*, 76 Cal.App.4th at pp. 99, 101.) In *Vichroy* the trial court did not instruct the jury about the preponderance of evidence standard for proof of the prior crimes. The appellate court found error because, even assuming the prior crimes were proved beyond a reasonable doubt, '[w]e do not believe proof beyond a reasonable doubt of a basic fact, that appellant committed prior sexual offenses, may act as "proxy" or substitute for proof of the ultimate fact, i.e., appellant's guilt of the currently charged offenses.' (*Id*. at p. 99.) The 'constitutional infirmity' is even greater where, as here, the jury was also instructed that the prior crimes need only be proved by a preponderance of evidence." (*People v. Orellano*, *supra*, at pp. 184-185.)

Other cases, although sometimes recognizing that the pre-1999 version of CALJIC No. 2.50.01 could be improved, have held that it (or the comparable instructions regarding evidence of domestic violence) did not violate the defendant's constitutional rights. (*People v. Jeffries* (2000) 83 Cal.App.4th 15, 21-25 [CALJIC No. 2.50.01]; *People v. Escobar*, *supra*, 82 Cal.App.4th at pp. 1097-1102 [CALJIC No. 2.50.02]; *People v. Waples* (2000) 79 Cal.App.4th 1389,

1396-1398 [CALJIC No. 2.50.01]; *People v. O'Neal* (2000) 78 Cal.App.4th 1065, 1076-1079 [CALJIC No. 2.50.01]; *People v. Regalado* (2000) 78 Cal.App.4th 1056, 1060-1063 [CALJIC No. 2.50.01]; *People v. Van Winkle* (1999) 75 Cal.App.4th 133, 139-149 [CALJIC No. 2.50.01].)

At least under the facts and overall instructions of this case, we believe the cases finding no constitutional infirmity in the pre-1999 version of CALJIC No. 2.50.01 (or No. 2.50.02) have the better view. It is no doubt useful to admonish the jury specifically that evidence of the prior sexual offense alone is not sufficient to convict, as the current standard instructions do. (CALJIC No. 2.50.01 (7th ed.); CALCRIM No. 1191.) But doing so is not critical. "[O]mission of the admonishment is not fatal to the instruction that was given." (*People v. Regalado*, *supra*, 78 Cal.App.4th at p. 1061.) The *Regalado* court made the point rather colorfully but, we believe, correctly, when it said that the CALJIC committee, by adding the admonishment, "added air bags to an instruction already equipped with seat belts." (*People v. Regalado*, *supra*, at p. 1060, fn. 2.)

Although our opinion in *Reliford*, *supra*, 29 Cal.4th 1007, relied in part on the admonition that was not given in this case to uphold the instructions of that case, its analysis is relevant here. We explained that a reviewing court must consider the instructions as a whole to determine whether there is a reasonable likelihood the jury applied the instructions in an unconstitutional manner. (*Id*. at p. 1013.) As applied to the issue here, we must determine whether it is reasonably likely the jury understood the instructions as a whole to mean it could convict defendant of Monique's murder based solely on the evidence of the prior sexual offenses. But, as in *Reliford*, the instructions never told "the jury it may rest a conviction solely on evidence of prior offenses." (*Id*. at p. 1013.) We concluded that, because of the instructions the jury heard concerning the reasonable doubt standard of proof, "[n]o reasonable juror would believe those requirements could

34

be satisfied solely by proof of uncharged offenses." (*Id*. at pp. 1013-1014.) Indeed, we said, the concept that proof of the prior crime is not enough to convict is a " 'truism,' " and that basing a conviction solely on uncharged conduct is " 'a logical impossibility.' " (*Id*. at p. 1014.) Specifically, we said it is not possible "to find each element of the charged crimes, as the jury was instructed to do before returning a guilty verdict, based solely on the [prior] offense. Nor is it possible to find a union or joint operation of act or conduct and the requisite intent for each charged crime, as the jury was also instructed to do. Hence, no reasonable jury could have been misled in this regard." (*Id*. at p. 1015.)

The *O'Neal* court pointed out that the defendant "urges us to read the instruction as if it had said: 'If you find that the defendant had this disposition, you may, but are not required to, infer solely from this evidence of a prior sexual offense that the defendant is guilty beyond a reasonable doubt of the crime[s] of which he is presently accused.' We think this is a strained and untenable reading of CALJIC No. 2.50.01. In order to make this inference, a juror would have to conclude that a defendant could be found guilty beyond a reasonable doubt of the currently charged crime even if no evidence whatsoever had been presented to prove the elements of the charged offense." (*People v. O'Neal*, *supra*, 78 Cal.App.4th at p. 1078.) Indeed, such a reading of the instruction would mean that any sex offender could be convicted of every sexual crime committed anywhere in California even if no evidence whatever connected the defendant with any of those crimes — an obviously absurd proposition.

The instruction merely told the jury it could "infer" from defendant's prior sexual crimes that he committed the charged crime. It did not say such an inference itself constituted proof beyond a reasonable doubt. The jury was also instructed that "an inference is a deduction of fact that can logically and reasonably be drawn from another fact or group of facts established by the

35

evidence." (See *People v. Jeffries*, *supra*, 83 Cal.App.4th at p. 22 [quoting a similar instruction].)  But a *logical deduction* is not the same as *proof beyond a reasonable doubt*.  No reasonable jury would assume that this inference, i.e., this logical deduction, substituted for proof beyond a reasonable doubt.  The instructions given "provide only that an inference of guilt *may be drawn* from prior offenses that have been proved by a preponderance of evidence.  They do *not* suggest that an inference so drawn is *sufficient* for a *finding* of guilt."  (*Id*. at p. 23.)  The jury still had to find that the facts of the charged crime had been proved beyond a reasonable doubt.  (*Id*. at pp. 23-24.)

Reviewing the instructions in this case as a whole bolsters this conclusion.  The jury was told to consider the instructions as a whole and, as noted, were told what an inference is.  Additionally, the court instructed repetitively and in detail on the reasonable doubt standard.  It repeated again and again, both in general and in stating the elements of the charged crime and special circumstance, as well as the lesser included offense of second degree murder, that the prosecution bore the burden of proof beyond a reasonable doubt, and that the jury must give the defendant the benefit of any reasonable doubt at every step of the way.  As in *Reliford*, *supra*, 29 Cal.4th at page 1013, the court also instructed the jury there had to be a union or joint operation of act or conduct and the required intent.  Additionally, nothing in the arguments of counsel suggested the jury could convict defendant of Monique's murder solely because of the prior sexual offenses.  Indeed, even the prosecutor began her argument by emphasizing the reasonable doubt standard.  Both the prosecutor and defense counsel discussed all of the evidence in detail, including, but far from limited to, the prior sexual offenses.

Reviewing the overall instructions and arguments of counsel, we, like the *Regalado* court, "are convinced the jurors would have realized that disposition evidence, while probative of defendant's guilt, must be assessed along with all the

36

other evidence to determine whether every element of the offense was proven beyond a reasonable doubt.  [Citation.]  They need not have been legal scholars to do so.  They knew [defendant] was not charged with the [prior offense].  Reasonably intelligent people would — on the instructions given here — merely have put the prior offense into the deliberative mix as a factor to be considered.  They would not have stopped after evaluating the prior and started signing verdict forms . . . ."  (*People v. Regalado*, *supra*, 78 Cal.App.4th at pp. 1062-1063.)

For these reasons, we find no reasonable likelihood the jury would view the instructions as permitting it to find defendant guilty of Monique's murder based solely on his prior sexual offenses.  (*Reliford*, *supra*, 29 Cal.4th at p. 1013.)

Defendant also argues that the instructions allowed him "to be convicted based on the preponderance of the evidence standard applicable to the predisposition evidence, rather than on the proof beyond a reasonable doubt standard."  We disagree.  The court merely told the jury it could not consider the evidence of the prior sexual crimes for *any* purpose unless it found he had committed them by a preponderance of the evidence.  Nothing in that instruction canceled the reasonable doubt instructions the jury also received.  "We do not find it reasonably likely a jury could interpret the instructions to authorize conviction of the charged offenses based on a lowered standard of proof.  Nothing in the instructions authorized the jury to use the preponderance-of-the-evidence standard for anything other than the preliminary determination whether defendant committed a prior sexual offense . . . .  The instructions instead explained that, in all other respects, the People had the burden of proving defendant guilty 'beyond a reasonable doubt.' "  (*Reliford*, *supra*, 29 Cal.4th at p. 1016; see also *People v. Carpenter* (1997) 15 Cal.4th 312, 383 [rejecting a similar argument].)

Defendant finally contends the court erred in not defining "preponderance of the evidence."  Because the court told the jury it could not consider the

evidence of the prior sexual offenses for any purpose unless it found he committed them by a preponderance of the evidence, it probably would have been better for the court to define the term, although it is unlikely the jury would have interpreted the term as imposing an even lighter burden of proof than it actually does. But the jury could not have been confused in any way prejudicial to defendant. He had been *convicted* of the prior sexual offenses, so the evidence that he committed them clearly satisfied the preponderance-of-the-evidence standard.

In short, although the instructions regarding the prior sexual offenses could have been better, they did not mislead the jury in any fashion prejudicial to defendant.

### F. Cumulative Prejudice

Defendant contends the cumulative effect of the asserted errors was prejudicial. We have found two errors: (1) the assumed error in admitting Sara Minor's testimony, which was harmless under *People v. Watson*, *supra*, 46 Cal.2d 818; and (2) error in overruling the lack-of-foundation objection to Faulkner's testimony, which was harmless beyond a reasonable doubt. Sometimes the cumulative effect of errors that are harmless in themselves can be prejudicial. But that is not the case here. The two items of evidence in question were directed primarily at different trial issues. Sara Minor's testimony was admitted on the question whether defendant committed a lewd and lascivious act on Monique. Faulkner's testimony was directed to when the body was deposited in the vacant lot, which was relevant to whether defendant was her killer. The effect of the two errors did not cumulate. We conclude the errors were harmless when considered together as well as when considered separately.

### G. Validity of the Lewd-and-lascivious-act Special Circumstance

The lewd-and-lascivious-act special circumstance applies to any person who is the actual killer during the commission of a lewd and lascivious act on a child under the age of 14. (Pen. Code, § 190.2, subd. (a)(17)(E), (b); see *People v. Anderson* (1987) 43 Cal.3d 1104, 1146-1147.) Defendant contends that the Eighth Amendment to the United States Constitution and international law require at least a finding that he either intended to kill or acted with reckless indifference to human life. We recently rejected the constitutional contention and see no reason to revisit the question. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 191-194.) Additionally, any death judgment that complies with state and federal constitutional and statutory requirements does not violate international law. (*People v. Lewis* (2008) 43 Cal.4th 415, 539.)

In response to defendant's argument that the current state of the law means a defendant might be death eligible even for an accidental killing, it is hard to imagine how the *actual killer*, who kills while committing a lewd and lascivious act on a child under the age of 14, can kill accidentally. Certainly Monique's death was no accident. Because defendant deposited her body in a vacant lot, leaving it to decompose for four days, the exact way he killed her could not be determined medically. But it appears defendant asphyxiated her, perhaps by choking her by the neck, as he had choked his two previous sexual assault victims. In any event, the evidence establishes that he acted with at least reckless indifference to her life when he killed her.

### H. Challenges to California's Death Penalty Law and Instructions

Defendant reiterates a number of challenges to California's death penalty law and the standard jury instructions that he recognizes we have repeatedly rejected. (See *People v. Schmeck* (2005) 37 Cal.4th 240, 303-304.) None of the claims are meritorious, and we see no reason to reconsider our previous decisions.

Penal Code section 190.2 is not impermissibly broad. (*People v. Schmeck*, *supra*, 37 Cal.4th at p. 304.) Factor (a) of that section, allowing the jury to consider the circumstances of the crime, has not been applied impermissibly broadly. ((*People v. Schmeck*, *supra*, at p. 304.) Except regarding evidence of other crimes, the jury need not find aggravating factors true beyond a reasonable doubt, and no instruction on burden of proof is required. (*People v. Mendoza* (2007) 42 Cal.4th 686, 707.) Other than the actual verdict, the jury need not make unanimous findings. (*Ibid*.) The instructions' use of the phrase "so substantial" is not impermissibly vague or ambiguous. (*Ibid*.) The instructions permissibly refer to whether the death penalty is "warranted" rather than "appropriate." (*Ibid*.) The instructions do not impermissibly fail to inform the jurors that a life sentence is mandatory if mitigating factors outweigh aggravating factors. (*Id*. at p. 707-708.) The instructions do not impermissibly fail to inform the jurors that even if they determined that aggravating factors outweigh mitigating factors, they could still return a life sentence. (*People v. Morgan* (2007) 42 Cal.4th 593, 625-626.) The instructions do not impermissibly fail to inform the jurors regarding the standard of proof and lack of need for unanimity as to mitigating circumstances. (*People v. Rogers* (2006) 39 Cal.4th 826, 897.) The court need not instruct on a presumption of life. (*People v. Morgan*, *supra*, at p. 627.) The jury need not make written findings. (*Ibid*.) The use of restrictive adjectives "extreme" and "substantial" in defining some of the statutory mitigating factors is permissible. (*People v. Schmeck*, *supra*, at p. 305.) The court need not delete inapplicable sentencing factors. (*People v. Mendoza*, *supra*, at p. 708.) The court need not instruct the jurors that statutory mitigating factors are relevant solely in mitigation. (*Ibid*.) Intercase proportionality review is not required. (*Id*. at p. 706.) The California death penalty scheme does not violate equal protection by treating capital and noncapital defendants differently. (*People v. Morgan*, *supra*, at p. 627.) The use

40

of the death penalty does not violate international law.  (*People v. Lewis*, *supra*, 43 Cal.4th at p. 539.)

## III.  CONCLUSION

We affirm the judgment.

CHIN, J.

WE CONCUR:

CANTIL-SAKAUYE, C.J.
BAXTER, J.
WERDEGAR, J.
CORRIGAN, J.
HALLER, J.*

_____

* Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING AND DISSENTING OPINION BY KENNARD, J.**

Defendant was charged with sexually molesting and murdering a 12-year-old girl. At trial, the prosecution presented evidence of defendant's two previous sexual assaults. The court instructed the jury that if it found that defendant had committed such offenses, it could infer that defendant " 'was likely to commit *and did commit* the crime of which he's accused.' " (Maj. opn., *ante*, at p. 30.) The majority upholds this instruction.

The majority concludes there is no reasonable likelihood that this instruction misled the jury: The trial court repeatedly reminded the jury that the prosecution had the burden of proving guilt beyond a reasonable doubt and that the jury had to resolve any reasonable doubt in favor of defendant; in addition, the prosecutor did not argue that the jury could convict defendant of the murder based solely on the prior sexual offenses. (Maj. opn., *ante*, at p. 36.) I agree that, in light of the other instructions, the prior sexual offense instruction at issue did not prejudice defendant. I disagree with the majority, however, that the instruction was proper.

In *People v. Reliford* (2003) 29 Cal.4th 1007, 1009, 1012, a majority of this court upheld a prior sexual offense instruction telling the jury that if it found *by a preponderance of the evidence* that the defendant had committed such a prior offense, that finding would be insufficient by itself to prove beyond a reasonable doubt that the defendant was guilty of the sexual offense charged. The majority

1

there held that the instruction would not have misled the jury as to the limited purpose for which the prior sexual crime evidence could be considered. (*Id.* at p. 1013.) I disagreed. In my view, the instruction was potentially misleading, because it implied that the jury could rely on the prior sexual offense as the sole basis for convicting the defendant of the sexual crime charged in that case, so long as the jury found the prior sexual offense allegations to be true under a standard of proof *higher than* a preponderance of the evidence. (*Id.* at pp. 1017-1018 (conc. & dis. opn. of Kennard, J.).) The instructional flaw is more serious in this case.

Here, the instruction told the jury that based on the existence of such prior offenses it could infer defendant's guilt of the sexual molestation charge in this case. The instruction as worded would permit a conviction of the crimes charged solely because of past sexual offenses. But a conviction of a crime must be based on evidence of that crime, not on prior offenses alone. (*People v. Falsetta* (1999) 21 Cal.4th 903, 923.) Unlike the majority, therefore, I would not uphold the validity of the instruction given here.


KENNARD, J.

2

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Loy

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S076175
**Date Filed:** July 7, 2011

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Charles D. Sheldon

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Marianne D. Bachers, Deputy State Public Defender, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and Susan Sullivan Pithey, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Marianne D. Bachers
Deputy State Public Defender
221 Main Street, 10th Floor
San Francisco, CA  94105
(415) 904-5600

Susan Sullivan Pithey
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 620-6344