Filed 1/17/14  P. v. Mantzouranis CA5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | F066125 |
| v. | (Super. Ct. No. CRF37647) |
| CALEB DANIEL MANTZOURANIS, SR., | **O P I N I O N** |
| Defendant and Appellant. | |

### THE COURT*

APPEAL from a judgment of the Superior Court of Tuolumne County.  James A. Boscoe, Judge.

Tara K. Hoveland, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Leanne Le Mon and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*	Before Levy, Acting P.J., Cornell, J., and Franson, J.

A jury convicted appellant, Caleb Daniel Mantzouranis, Sr., of driving under the influence of drugs and/or alcohol (Veh. Code, § 23152, subd. (a)), and in a separate proceeding appellant admitted a special allegation that he had suffered a prior conviction of that offense (Veh. Code, §§ 23550, 23550.5). The court suspended imposition of sentence and placed appellant on five years' probation, one of the conditions of which was that he serve nine months in county jail.

As discussed more fully below, prior to the defense's presentation of the testimony of an expert witness, the court made a ruling prohibiting the expert from testifying as to any opinion that the expert based on certain matters set forth in a document prepared by a physician who, according to defense counsel, had treated appellant. On appeal, appellant argues that this ruling violated Evidence Code section 801 (section 801) and appellant's rights under the United States and California Constitutions "to Due Process, a fair trial and to present a defense" because the ruling "improperly restricted appellant's direct examination of his expert witness regarding a critical issue." We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

*Facts – Prosecution Case*

<u>Testimony of Deputy Speers</u>

At approximately 1:40 a.m. on April 10, 2011 (April 10), Tuolumne County Deputy Sheriff Robert Speers was on patrol when he observed a car that, while traveling around a bend, crossed the fog line before correcting its course and returning to its lane. The car then slowed down to approximately five miles per hour. The posted speed limit was 35 miles per hour.

Speers followed the car in his patrol vehicle, and observed the car, while still traveling at approximately five miles per hour, go off the roadway onto the shoulder several times. At that point, Speers, who was traveling behind the car, turned on his emergency flashers to initiate a traffic stop. The driver of the car—later determined to be

2

appellant—pulled into a convenience store parking lot, where he parked the car in a space, after first backing up and pulling into the space two or three times. Appellant then got out of the car. He "seemed unsteady on his feet," and Speers had him sit back down in the car, explained the reason for the stop and asked for appellant's identification. Appellant's speech was slurred and he "seemed really slow to come up with responses to normal questions." At that point, Speers asked appellant to step out of the car.

Appellant complied, and again "appeared very unsteady on his feet." He told Speers he had just fallen and hit his head but Speers saw no marks consistent with this. Speers directed appellant to the sidewalk, where appellant stood leaning against a building, and Speers placed a call to the California Highway Patrol (CHP) "to come and conduct an evaluation." Speers opined, using a scale of 0 to 10, with 10 indicating highly intoxicated and 0 indicating sober, that appellant was "[p]robably a seven or an eight." While Speers was waiting for a CHP officer to arrive he asked appellant if he had taken any drugs or medication. Appellant responded he had not.

*Testimony of Officer Mahaney*

CHP Officer Joshua Mahaney arrived on the scene at approximately 2:28 a.m. on April 10. Upon making contact with appellant, Mahaney observed that appellant was unsteady on his feet, his speech was slurred, his eyes were red and "he had a … confused look on his face." Mahaney asked appellant if he had "any physical impairments … that would affect [his] ability to stand, walk." Appellant responded "he did not have any physical defects."

Mahaney then administered a series of field sobriety tests to appellant. Mahaney's practice when administering these tests is to tell test subjects not to begin any of the tests until he (Mahaney) instructs them to begin.

Mahaney first conducted a horizontal gaze nystagmus test, which can show the presence of head injury. The test showed no indication of such injury.

3

Mahaney next administered the Romberg balance test.  He told appellant to stand, and, when told to do so but not before, tilt his head back, estimate when 30 seconds had passed, and at that point put his head back down, look at the officer and state he had finished the test.  Appellant began the test before being told to begin, estimated 25 seconds to be 30 seconds and swayed approximately one to two inches from center.  The "C.H.P. D.U.I. manual" says swaying "within one inch … can be present."

Next, Mahaney administered the one-leg stand test.  He told appellant that while standing, and upon being told to begin, while keeping his arms as this side, to lift one foot six inches off the ground, look at the toes of the raised foot, and count out loud until directed to stop.  Appellant raised his foot off the ground before being told to begin and immediately upon doing so began losing his balance, at which point he raised his arms away from his body and began hopping to regain his balance.  He did not count as instructed.  He could raise his foot for only two or three seconds before setting it down.

Next, Mahaney explained to appellant the finger-count test, telling him to choose which hand to use and then, when told to do so, touch the tip of his thumb to the tips of his fingers in succession while counting.  Appellant began the test before being told, missed his touches several times, and when he did touch his fingers, he did so "in a sweeping motion instead of a distinct tip to tip."

Finally, Mahaney administered a preliminary alcohol screening test, which was negative for the presence of alcohol.  Mahaney formed the opinion, based on his "entire contact" with appellant, that appellant was unable to operate a motor vehicle safely.

*Testimony of Toxicologist Giorgi*

California Department of Justice toxicologist Nadina Giorgi testified to the following:  She tested a blood sample taken from appellant.  The test showed the sample contained, inter alia, Zolpidem, a sleep aid also known as Ambien, and Carisoprodol, a muscle relaxant also known as Soma.  The effects of Ambien typically last approximately

4

eight hours and Soma's effects typically last approximately four to six hours. Both drugs are central nervous system depressants; the effects of such drugs include drowsiness, dizziness, lack of coordination, slurred speech, confusion and loss of balance. In response to a hypothetical question positing facts similar to those of the instant case, Giorgi opined that the driver would be "too impaired by the presence of the drugs to safely operate a motor vehicle."

***Facts - Defense Case***

<u>*Testimony of Toxicologist Zehnder*</u>

Jeffrey Zehnder, a forensic toxicologist, testified as an expert witness to the following:

In the Romberg test, the term "sway" is vague. "[T]here is really no standard for sway in terms of drug or alcohol impairment," and the "sway aspect doesn't have a lot of value." A subject starting the test before being instructed to do so "hasn't really been adequately studied" and "we don't know what it means."

The finger count "is not a standardized test" and "there is not a lot of support for … what it means." The one-legged stand test is "not … conclusive" as to whether the subject is impaired by drugs or alcohol because a sober person might have difficulty standing on one leg. Injury can affect performance on field sobriety tests.

The drug Ambien is designed to induce sleep. Persons who take the drug can develop a tolerance, such that a person "[would] have to take more of the drug to get the same effect." Persons taking Soma can also develop a tolerance for the drug. For both Soma and Ambien, it is "very difficult to evaluate impairment in terms of blood levels … because of the tolerance that can occur." There is "[no] proven correlation between an Ambien level and any particular level of impairment[.]"

5

Zehnder viewed and listened to a video/audio recording of the traffic stop. The video did not show the field sobriety tests. Zehnder did not hear appellant exhibit slurred speech. Appellant "sounded like a sober person …."

In response to a hypothetical question positing facts similar to the instant case and which included the factor that the person involved had a hip injury that would eventually require hip replacement, Zehnder opined, "I wouldn't be able to say with this information, basically, that they were impaired." Zehnder also testified that "crossing over the fog line on a curve once is not evidence of impairment because … that is something that a sober person could do.

*Appellant's Testimony*

Appellant testified to the following: As of the time of trial, he had been taking Ambien and Soma for over three years. On the night he was stopped, he took Soma at approximately 6:00 p.m. and Ambien at approximately 8:00 or 9:00 p.m.

At approximately 1:30 a.m., at his wife's request, he set out in his car for a convenience store to buy some cigarettes. As he was driving he saw two patrol cars, at which point he slowed down from approximately 35 miles per hour to approximately 15 miles per hour. Appellant saw Deputy Speers following him and he pulled over "[s]everal times" to let him pass. When appellant parked in the convenience store parking lot he "knew that there was an officer behind [him] and [he] didn't want a ticket for parking over the lines …." He did not recall why he needed multiple tries to park between the lines; he testified, "I think there was … a vehicle in the way and I didn't want to hit [it] …."

Appellant suffered a crushed pelvis in 1986. He has chronic arthritis in "both sides" of his hips. He had "problems" with the one-legged stand test because of his arthritis, which "makes it hard." He told Officer Mahaney that he did not have any "physical impairments" because he "[does not] consider [his] hips an impairment."

6

***Procedural Background***

*Dr. Renwick's Report*

Appellant's argument on appeal concerns a document entitled "MEDICAL RECORD Progress Notes" (report) prepared by a person identifying himself in the report as Kenneth Renwick, MD, MPH, medical director of "TMWIHC, Inc." In the report, Dr. Renwick stated the following:

He had "been asked to write a note regarding the medication [appellant] was taking" on the night he was stopped by police.

A blood sample was taken from appellant at 3:20 a.m. on April 10. Appellant has taken Ambien and Soma "for some years" to help him sleep, and he had taken these medications, in amounts set forth in the report, approximately six hours prior to his blood being drawn. The test of appellant's blood showed the presence of Ambien and Soma at levels that "rated low therapeutic, indicating that they were wearing off, and had not been used in excess." In addition, "Given [that appellant] had used [those medications] for years, he had accommodated to the medication side effects so that at any level he would be less impaired than a new user, and the medications would also be less effective at helping him sleep."

The report also stated: "[Appellant] also suffers from chronic pain due to old orthopedic injuries. He has an old pelvic fracture … and deformity of the obtorator formain due to hip trauma. He has been told he will need hip joint replacement. These injuries make it hard for him to stand on one leg, making one legged standing an invalid field sobriety test."

Dr. Renwick concluded: "In my opinion [appellant] can not [*sic*] be validly considered intoxicated based on the field test and on the drug levels found. The low drug levels suggest that the medications were wearing off, and would have little, if any effect

7

on a chronic user of those medications. The invalid field sobriety test likely misidentified an orthopedic problem as an intoxication."

*The Challenged Ruling*

Prior to Zehnder's testimony, the prosecutor informed the court that he (the prosecutor) was "anticipating that Mr. Zehnder is not going to be basing any of his testimony on the information contained in [the report] because absent that testimony, there is no foundation," and that he (the prosecutor) was "seeking to … put everyone on notice that foundation objections would be made …."

The court asked defense counsel if Zehnder "rel[ied] on [the report] in forming his opinion[.]" Defense counsel explained that Dr. Renwick was appellant's treating physician, and that "experts rely upon information like that all the time." Counsel further stated as follows: " … [Appellant] is going to [testify] that he does have a hip injury and that he … has, in fact, taken the Ambien and Soma for quite a while. So that information will come in, not from the doctor. [¶] [Dr. Renwick] also states an opinion as to impairment, which I really don't think that doctor is … qualified to give, so there are problems with the content of the [report]. I didn't control it." The court at that point directed defense counsel to "Find out if [Zehnder] relied on [the report], and what his testimony is going to be, and … the extent [to which] he relied on [the report]." Counsel stated she would do so, and that "[her] knowledge is [Zehnder] relied upon "the fact" that appellant had taken Ambien and Soma "for a while" and that "there was a hip injury. That's it."

Later that day, the court asked defense counsel if she had spoken to Zehnder. Counsel responded, "I told Mr. Zehnder that [appellant] is going to provide evidence with respect to his pelvic fracture and the length of time he's been using Ambien, so that will come in." The court responded that its "concern" was that the court knew nothing about Dr. Renwick or his qualifications, and that Dr. Renwick had "expressed [in the report]

8

opinions … that he may not be qualified to give based on his training and experience." Defense counsel responded, "I think that is correct."

The court further stated, "… to the extent that [Zehnder's] opinion is based on the content of [the report] … I certainly don't expect [Dr. Renwick's] opinion to be expressed by Mr. Zehnder." Counsel stated, "No."

The court continued, "I don't want [Zehnder] to rely on the opinions of Dr. Renwick as they related to the effects of Ambien." Counsel responded, "Oh no, he wouldn't be."

The court concluded: "But in terms of the opinions expressed by Dr. Renwick as it relates to the orthopedic injuries or the effect of Ambien and the summary in this [report] that's basically Dr. Renwick's opinion, I don't expect Mr. Zehnder to rely on that [report] as a basis for his opinion."

## DISCUSSION

Section 801 limits expert opinion testimony to an opinion that is, inter alia, "[b]ased on matter ... perceived by or personally known to the witness or made known to [the witness] at or before the hearing, whether or not admissible, *that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the expert] testimony relates ....*" (Evid. Code, § 801, subd. (b), italics added.) Appellant contends the court's ruling on Zehnder's testimony violated section 801 because (1) the report was prepared by appellant's treating physician and was therefore the "type of material which is regularly reasonably relied upon by related experts in forming their opinions," and (2) the court's ruling "restricted" the defense expert's testimony so as "to exclude evidence" contained in the report, viz., "evidence of appellant's orthopedic injuries." (Emphasis, unnecessary capitalization omitted.) The court's error was prejudicial, appellant argues further, in part because "[it] left appellant

9

as the only person who could tell the jury about his injuries, a critical issue in his defense."

Appellant's claim lacks merit. We recognize that, as appellant points out and as the court stated in *People v. Gardeley* (1996) 14 Cal.4th 605, 618, under section 801, "Expert testimony may … be premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions. [Citations.] Of course, any material that forms the basis of an expert's opinion testimony must be reliable." However, this rule does not permit what appellant seeks to accomplish here, viz., putting before the jury inadmissible hearsay (Evid. Code, § 1200), in the guise of the basis for expert opinion testimony, as independent proof of facts—in this case appellant's injuries. As the court stated in *Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516: "Although experts are … given considerable leeway as to the material on which they may rely, the rules governing actual communication to the jury of any hearsay matter reasonably relied on by an expert are more restrictive. Although experts may properly rely on hearsay in forming their opinions, they may not relate the out-of-court statements of another as independent proof of the fact. [Citations.] Although an expert 'may rely on inadmissible hearsay in forming his or her opinion [citation], and may state on direct examination the matters on which he or she relied, the expert may not testify as to the details of those matters if they are otherwise inadmissible [citation].' [Citations.] In *People v. Coleman* (1985) 38 Cal.3d 69, 92, the Supreme Court said with regard to an expert witness that '... he may not under the guise of reasons bring before the jury incompetent hearsay evidence.' [Citation]." (*Id.* at pp. 1524-1525.)[1]

---

[1] The case of *People v. Coleman*, *supra*, 38 Cal.3d 69 was disapproved on another point in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32.

We find instructive *People v. Loy* (2011) 52 Cal.4th 46 (*Loy*). In that case, a murder prosecution, a prosecution expert, entomologist David Faulkner, testified as to two points regarding maggots found on the victim's body. First, he testified, based on the maggots' development, how long they had been associated with the body. Second, he testified as to the time and date the maggots were deposited on the body. Faulkner based this second conclusion on a letter he had received from the medical examiner's office saying that maggot samples had been collected on certain dates. The trial court overruled the defense's lack-of-foundation objection to this evidence.

The appellate court found no error in the court's ruling as to the first point. Citing the principle that "'Under … section 801, expert opinion testimony is admissible only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact,"'" the court stated that the length of time the maggots had been associated with the body, based as it was on the expert's knowledge of how such organisms develop, was "clearly a subject sufficiently beyond common experience that expert opinion would assist the jury." (*Loy*, *supra*, 52 Cal.4th at p. 69.)

The entomologist's second point, however, was a different matter. Faulkner testified he learned of the date the maggots were collected—the purported fact upon which he based his conclusion as to when the maggots were deposited on the body—from a letter from the medical examiner. (*Loy*, *supra*, 52 Cal.4th at p. 68.) Thus, the court pointed out, Faulkner's testimony as to when the sample was collected, and his resultant conclusion as to when the maggots were deposited on the body, were based on hearsay. (*Ibid.*)

The court acknowledged the principle, asserted by the Attorney General—and by appellant here—that "'Expert testimony may … be premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by

11

experts in the particular field in forming their opinions.…'" (*Loy*, *supra*, 52 Cal.4th at p. 68.)  However, the court held that "Faulkner's testimony regarding the date the samples were collected does not come within this rule" because "when the sample was collected was a simple question of fact that the jury could decide for itself without expert guidance." (*Loy*, *supra*, at pp. 68, 69, italics omitted.)  That is, Faulkner's testimony on this point ran afoul of the rule set forth in section 801 that expert opinion evidence "is limited to such opinion as is "(a) Related to a subject that is sufficiently beyond common experience that the opinion of the expert would assist the trier of fact …." (§ 801, subd. (a).)  Accordingly, the appellate court held the trial court erred in overruling the defendant's lack-of-foundation objection to the expert's testimony as to when the maggots were deposited on the body.

Thus, *Loy* teaches that expert opinion testimony based on information that presents "a simple question of fact" that a jury "[can] decide for itself without expert guidance" (*Loy*, *supra*, 52 Cal.4th at p. 69) will not survive a lack-of-foundation objection.  Such a "foundational fact[ ]" is "for others to establish." (*Ibid*.)  The information in Dr. Renwick's report regarding appellant's injuries—that appellant had suffered a pelvic fracture and had a "deformity" caused by hip trauma that made it difficult for him to stand on one leg and which, appellant had been told, would necessitate surgery to replace his hip joint—is precisely this kind of information.  Therefore, under *Loy*, the defense in the instant case could not be permitted to establish the purported facts regarding appellant's physical condition through Zehnder's testimony as to what Dr. Renwick said in his report.  Appellant's claim that he should have been allowed to present evidence of his physical limitations through the testimony of the defense expert witness must be rejected.

Appellant also argues that the court's ruling violated not only section 801, but also his rights to a fair trial and to present a defense under the Due Process Clauses of the

California and United States Constitutions. (See Cal. Const. art. I, § 7; U.S. Const. 5th & 14th Amends.) This contention too is without merit.[2]

"As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense." (*People v. Hall* (1986) 41 Cal.3d 826, 834.) Here, appellant testified that he suffered a crushed pelvis in 1986 and that he has chronic arthritis in both hips, and he performed poorly on the one-legged-stand portion of the field sobriety testing because of his injuries. Thus, he was not prevented from presenting the portion of his defense that was based on his physical injuries. He was merely precluded from proving this part of his defense with hearsay evidence that was inadmissible under the ordinary rules of evidence. Therefore, the court's ruling did not violate appellant's constitutional due process rights.

We conclude further that even if the court erred in ruling Zehnder could not testify as to appellant's physical infirmities as related in the report, such error was harmless. First, the source of Dr. Renwick's information regarding appellant's injuries is not apparent from the report. The report did not state that Dr. Renwick based his statements on his examination of appellant. Insofar as the report reveals, Dr. Renwick could have simply been reporting what appellant told him. Absent any showing of the basis of Dr. Renwick's statement regarding appellant's injuries, that statement is of little probative value and would not have added significantly to appellant's testimony on the subject. In addition, evidence of appellant's orthopedic problems does not have a bearing on other

---

[2] Appellant did not make this constitutional argument in the trial court. We assume without deciding that appellant's constitutional claims are cognizable on this appeal. (See *People v. Thornton* (2007) 41 Cal.4th 391, 443 ["'[a] party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct'" but a constitutional claim is not forfeited if "it merely asserts that the trial court's ruling, insofar as wrong on grounds actually presented to that court, had the additional legal consequence of violating the Constitution"].)

evidence damaging to the defense, such as appellant's erratic driving, his difficulty in parking and his slurred speech.

Because the error complained of is not of constitutional dimension, reversal is not compelled unless "it is reasonably probable that a result more favorable to [appellant] would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Under this standard, any error by the court in refusing to allow Zehnder to testify to factual matters set forth in the report was harmless.

**DISPOSITION**

The judgment is affirmed.