Filed 2/24/14  P. v. Stutzman CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JEREMY RYAN STUTZMAN,<br><br>    Defendant and Appellant. | D063050<br><br><br><br>(Super. Ct. No. SCN292337) |

APPEAL from a judgment of the Superior Court of San Diego County, Richard E. Mills, Judge.  Affirmed.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Andrew Mestman, Deputy Attorneys General for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted Jeremy Stutzman of forcible rape (Pen. Code, § 261, subd. (a)(2); count 1);[1] forcible oral copulation (§ 288a, subd. (c)(2)(A); counts 2 & 3); false imprisonment (§§ 236, 237) as a lesser included offense of kidnapping to commit rape or oral copulation (counts 4 & 5); sexual battery by restraint (§ 243.4, subd. (a); counts 6 & 7); assault with a deadly weapon (§ 245, subd. (a)(1); counts 8 & 9); petty theft (§ 484) as a lesser included offense of robbery (count 10); robbery (§ 211; count 11); first degree burglary (§§ 459, 460; count 13);[2] and carjacking (§ 215, subd. (a); count 14). As to counts 1 through 3, the jury found true allegations of aggravating circumstances under the One Strike law, including tying or binding the victim and personally using a deadly weapon (§ 667.61, subds. (a), (c) & (e)(3) & (5)).[3] As to counts 1 through 6 and 8 and 9, the jury found true allegations Stutzman used a knife during the commission of the offenses (§§ 1192.7, subd. (c)(23), 12022, subd. (b)(1), 12022.3, subd. (a)). In addition, the trial court found true allegations Stutzman had a prior serious felony conviction (§ 667, subd. (a)(1)) and prior strike convictions (§§ 667, subds. (b)-(i), 1170.12). The court sentenced him to an aggregate prison term of 400 years to life plus 16 years.

---

[1] Further statutory references are also to the Penal Code unless otherwise stated.

[2] The jury acquitted Stutzman of another count of first degree burglary (count 12).

[3] The One Strike law requires a sentence of 25 years to life whenever a defendant is convicted of specified offenses under specified aggravating circumstances. (*People v. Hammer* (2003) 30 Cal.4th 756, 761.)

Stutzman appeals, contending the court violated his constitutional right to a unanimous jury decision by discharging a holdout juror.  He additionally contends there was insufficient evidence to support his carjacking conviction and the court erred in admitting propensity evidence under Evidence Code section 1108 because the statute is facially unconstitutional.  Alternatively, he contends the court abused its discretion by not excluding the propensity evidence under Evidence Code section 352.  We conclude these contentions lack merit and affirm the judgment.

BACKGROUND

*People's Evidence*

Kimberly M. and Nicole P. lived in Nicole's upstairs apartment.  Stutzman lived in the apartment directly below.  Nicole and Stutzman were not friends and never had a dating or sexual relationship, but they were neighborly.

One day while Nicole was packing up her belongings from her apartment to move to another part of the state, Kimberly used Nicole's car to take Stutzman to purchase some methamphetamine.  When Kimberly and Stutzman returned, they went to Nicole's apartment and the trio smoked the methamphetamine.[4]

After about an hour, Stutzman indicated he wanted to purchase more drugs.  Kimberly used Nicole's car to take him to meet his supplier.  After driving around for a while, Stutzman told Kimberly he needed to go to his work to get some marijuana from a

---

[4]     Nicole and Kimberly testified under grants of immunity for any drug-related crimes.

3

coworker. Kimberly drove him to his workplace and parked up the street from it. At his insistence, she went inside with him. He began rummaging around looking for something. After about seven minutes, he came up behind her, put his hand around her face, put a knife to her throat, and told her not to say or do anything or he would kill her.[5] He tied her hands behind her back, put a piece of cloth in her mouth and repeatedly told her he would kill her if she did anything. He took her to an office and had her sit in a chair. He untied her hands and made her call Nicole to say they were running late. He then retied her hands in front of her, put the gag back in her mouth, placed a T-shirt over her head, put his arm around her shoulder and walked her to Nicole's car while holding a knife to her side and threatening to kill her. He grabbed the keys to the car from her, opened the passenger door, pushed her into the passenger seat and drove her back to Nicole's apartment.

Once they arrived back at the apartment complex and parked, he opened the passenger door, grabbed her, put a baseball cap on her head, put his arm around her, and walked her to his apartment. He took her into his bedroom, where there was a chair and black and orange rope. He sat her in the chair and tied her ankles to it with the rope. He blindfolded her and exposed her breasts by cutting off her shirt and bathing suit top with a large hunting knife. He rubbed and kissed her breasts and then hogtied her. He moved

---

[5]     The morning after the incident, Stutzman's employer noticed a large knife was missing from Stutzman's workplace.

her to his mattress and held a phone to her ear. He instructed her to tell Nicole they were at his apartment with the drugs and to come down.

Nicole received a phone call from Kimberly, who said she was downstairs with Stutzman, they were going to split up the drugs, and everything was okay. Wanting her keys back, Nicole went downstairs. Stutzman was outside on the phone. Because his door was wide open, Nicole went inside his apartment.

As soon as she entered, the door closed behind her and Stutzman stood in front of her holding a large hunting knife. He told her in a threatening manner to do what he said or he would hurt Kimberly. He dragged her to his bedroom where she saw Kimberly in the corner, on her stomach, hogtied, gagged, and blindfolded. Money and women's clothing were on the ground.

Stutzman sat Nicole on a chair, tied her wrists and ankles to it, and blindfolded her. She asked him what he was doing and he said one of them had "snitched," which confused her because neither she nor Kimberly had done anything that would qualify as "snitching." She kept asking questions and he told her to shut up. She heard him leave the room and go upstairs to her apartment. When he could not get inside, he returned to his bedroom, cut her restraints, put a large jacket over her, and took her to her apartment. Once there, he asked her for her cell phone and her purse, then took her into her bedroom, tied her wrists to her ankles using a tie from one of her robes, and left. At some point, he took her cell phone, purse, laptop, laptop case, and some of her lingerie to his apartment.

While Stutzman was gone, Nicole attempted to free herself. When he returned and saw her attempt, he became very angry. He told her to take him seriously or he

would hurt Kimberly. He pulled her up and took her back downstairs. He told her to act normally. He also told her he would kill Kimberly if she screamed.

When they returned to his apartment, he took her to his bedroom and once again blindfolded her, gagged her, and tied her to the chair, but this time more securely. He sliced through her shirt with a knife, exposing her bra. He put her driver's license on her shoulder and started making a video recording. He groped her breast over her bra and said something about doing his job and getting the snitches. He subsequently moved her into the bathroom and turned his attention to Kimberly.

He cut Kimberly's restraints, threw some clothes at her, and instructed her to put the clothing on. Over a 10-minute period, he instructed her to change outfits three or four times. At some point, he took her upstairs to Nicole's apartment. When they returned to his apartment, she was wearing Nicole's lingerie. Stutzman took her to his bedroom. He then went to the bathroom, cut Nicole's restraints, and moved Nicole to his bedroom. He had the two women kneel next to one another with their knees on the floor and their stomachs on the bed.

After making Nicole take her hair down and then put it back up, he took her to the living room where she saw all of her lingerie scattered on the floor. He made her bend over a chair and he pulled down her pants and underwear. He pulled out his penis and put it on her buttocks while rubbing the outside of her vagina with his hunting knife.

He then went back into his bedroom, returned with Kimberly, sat on the couch, and, at knifepoint, demanded Kimberly orally copulate him. He placed his penis in Kimberly's mouth, but she did not suck it. He became angry pushed her aside and said,

6

"Good thing there's two of you."  He went over to Nicole, grabbed her, dragged her to the couch and told her at knifepoint to "[s]uck on it or I'll kill your friend."

Nicole orally copulated him.  When his penis became erect, he took Nicole back to the chair, made her bend over it, and penetrated her vagina with his penis.  He pulled her hair back, held a knife to her neck and asked her, "Do you like that?"

After some minutes, he dragged Nicole to his bedroom, made her put on black spandex pants, took her to the bathroom, and made her hold onto the shower curtain with her bound hands while he recorded himself putting his hands and mouth on her breasts.  He then put her in a corner of his bedroom, hogtied her, tightened her gag, placed a T-shirt over her head, and covered her with a sleeping bag and a large blanket.  He ordered her not to scream and told her he was taking Kimberly upstairs.  When she told him she was claustrophobic and could not breathe, he told her to shut up.

After he left, Nicole started having a panic attack and "went into Hulk mode."  She removed the T-shirt from her head by dragging her head on the floor.  She removed the restraints from her wrists by manipulating her wrists and bending them the wrong way.  She ran to the apartment of a couple she did not know, knocked on their door, said she had been raped, and asked to call 911.  She told them someone with a knife might be following her.  She was scared, crying, and shaking, and had pieces of men's neckties tied to her ankles.

Meanwhile, Stutzman took Kimberly to retrieve Nicole's car.  When they returned to his apartment, he realized Nicole was gone.  He angrily grabbed Kimberly by the neck and said, "Nicole's gone and you're f—ing dead."  He grabbed some money from his

7

apartment and took Nicole's purse and some clothing from her apartment. He and Kimberly then went to Nicole's car and left, with Kimberly driving. He told Kimberly that Nicole had "messed this all up for him," his life was ruined, and Kimberly was going to "pay for it."

As they left, they saw a police car pulling into the apartment complex. Stutzman held a knife to Kimberly's side and told her he would kill her if she "even looked in their direction." As they drove, Stutzman threw what appeared to be a cell phone out of the window.[6] At some point, they pulled over and Stutzman started driving.

Upon arriving at the apartment complex, San Diego County deputy sheriffs checked both apartments. Inside Stutzman's apartment, the deputies saw clothing scattered all over the living room and bedroom, small amounts of money scattered in the bedroom, chairs in the bedroom and bathroom with neckties tied to the legs, a kitchen knife on the bedroom floor, and another kitchen knife on the dining room table. There were also numerous items of cut clothing, including neckties, underwear, and a robe belt.

Deputies spoke with Nicole in her apartment. She was disheveled, visibly shaken, very upset, crying, and very concerned and afraid for Kimberly. She had cut neckties tied around her ankles. Her wrists were red and had slight ligature marks around them.

Meanwhile, Stutzman and Kimberly drove for several hours throughout San Diego County. At one point, Stutzman pulled over, forced Kimberly out of the car, leaned her

---

[6] At the sheriff's department's request, Nicole's cell phone carrier pinged her cell phone. A deputy located the phone on top of some leaves a few feet from a roadway, approximately one mile from her apartment.

8

against the hood, rubbed up against her and tried to take her pants off.  When Kimberly told him she wanted him to stop, he pushed her back into the car.  At another point, Stutzman called his fiancée from a payphone and told her the incident was a misunderstanding, Nicole and Kimberly were lying, and he would "get it cleared up."

Sometime later, Stutzman threw another object from the car.[7]  When the sun began to come up, Stutzman twice attempted to get a hotel room, but was unsuccessful because identification was required.  Eventually, Stutzman paid a homeless man to get a room for him.  Inside the room, Stutzman threw Kimberly on the bed, rubbed her legs, kissed her neck, and made her put on a black skirt.

That morning, Stutzman contacted his parole officer.  He told the officer the incident was a misunderstanding and had Kimberly speak to the officer.  Kimberly told the officer the incident was a misunderstanding.  The officer asked her to come into his office so Stutzman could be cleared of any allegations, but she said she would rather go home to sleep.  The officer then spoke to Stutzman again and told Stutzman to report to the parole office right away.

Stutzman told Kimberly if she told law enforcement the incident was a misunderstanding, he would let her go.  He drove her back to the apartment complex, dropped her off on a corner and told her to "stick to your story."  She walked across the

---

[7]    Stutzman wore a GPS ankle bracelet as a condition of parole to pinpoint his location every minute of the day.  Around 11:00 p.m. the evening of the incident, Stutzman's parole officer received a "bracelet strap alert," suggesting Stutzman tampered with the strap.  The morning after the incident, a parole officer found the ankle bracelet in bushes on the side of a freeway.

street to Nicole's apartment. A deputy saw her walking up the driveway crying. She was trembling and had bruises on her arms and legs. She told the deputy Stutzman was driving the same vehicle, he had shaved, he had three knives, and he was possibly staying at a motel by the beach.

Later that morning, sheriff's detectives went to the hotel where they believed Stutzman was staying. They searched the room Kimberly identified and the hallway outside the room. They found her cell phone in a trash can in the hallway. One of the detectives found Nicole's car in the parking lot of an adjacent motel. Inside the vehicle, he found a bathrobe belt that appeared to be cut or ripped. Sheriff's deputies found Stutzman's girlfriend in one of the rooms of the motel. A short time later, a deputy arrested Stutzman in the stairwell of the motel.

A nurse conducted a sexual assault examination of Kimberly. Kimberly had bruising on multiple parts of her body, including her arms, the top of her hands, left shoulder, and left hip. She had ligature marks on her wrists, abrasions and bruises on the top of her feet, and ligature marks on her feet and ankles. Head, neck, oral and genital examinations produced no remarkable findings. The nurse collected a urine sample, a blood sample, and swabs from Kimberly's breasts, cheek, and fingernails. The nurse's observations of Kimberly were consistent with the history Kimberly provided.

Another nurse conducted a sexual assault examination of Nicole. During the examination, Nicole was anxious and tearful. She had redness and abrasions on her wrists, abrasions on her back and left posterior thigh, and bruises on her shins, left elbow, fingernails, right hand, and left shoulder. She had an abrasion and red area under her

10

tongue. She also had pinprick bruises on the top of her mouth, which is consistent with forced oral sex.

She had "a lot of injury" to her genitalia, including abrasions to her labia minora, hymen, and perihymenal area. She also had a laceration on the bottom of her vagina caused by blunt force trauma. The nurse testified this type of injury is a mounting injury and generally occurs "when a penis or an object first is going into the vagina." The nurse described the injury as "huge" and the laceration as "open" and "seeping," indicating it happened a few hours prior to the examination. The injury was consistent with nonconsensual sexual activity.

The nurse collected various samples from Nicole, including a urine sample and swabs from Nicole's mouth, vagina and anus. The nurse concluded Nicole suffered blunt force trauma genitally and indicated the examination was consistent with the history provide by Nicole.

The same nurse also conducted a sexual assault examination on Stutzman. She collected a blood sample from him and took swabs from his cheek, penis and scrotum.

DNA analysis of the samples indicated there was no male DNA in the oral and breast swabs taken from Kimberly and no semen in the oral and fingernail swabs. There was no semen or male DNA in the vaginal, external genital, and breast swabs taken from Nicole. There was semen and DNA from an unknown male in the swabs taken from Nicole's buttocks.

There was no semen in the swabs taken from Stutzman. The penile swabs taken from Stutzman showed a mixture of DNA from at least three contributors, two of whom

11

were major contributors. Stutzman was included as one of the major contributors and Nicole was included as a possible major contributor. It was 2.2 million times more likely Stutzman and Nicole were the major contributors than Stutzman and an unknown person. The scrotal swabs taken from Stutzman also showed a mixture of DNA from at least three contributors. Stutzman was included as a major contributor, but due to the sample's low level the other contributors were unknown.

Jennifer R. testified that 11 years before the events of this case, Stutzman went to her apartment to retrieve some videotapes he had loaned her brother.[8] When he arrived, Jennifer was talking on the phone and the videotapes were on the floor by the door. Rather than grabbing the videotapes and leaving, Stutzman stepped inside, stating he left something else there as well. She told him to feel free to get whatever it was. Instead, he sat on the couch, started talking to her four-year-old nephew, and waited for her to get off the phone. When she hung up the phone, he told her he left a bag in her back bedroom. She told him to get it, but he said he did not want to go back there and look through her stuff. She asked him to describe what he was looking for and told him she would get it. She started walking back toward her room and, as soon as she was out of her nephew's sight, Stutzman came up behind her and pulled a gun out of his fanny pack. He held the gun to her head and told her to "shut up and don't be stupid." He directed her to go into the bedroom.

---

[8]     Jennifer was deemed unavailable as a witness and her prior testimony was read into the record.

He looked through her closet and told her he wanted her to change clothes. She put on a T-shirt and a long skirt. He asked her if she had anything sexier to put on and she said she did not. He hogtied her with rope from his fanny pack. He also blindfolded and gagged her. At some point after he gagged her, her nephew knocked on the door. Stutzman removed the gag and told her to tell her nephew she was sick and was going to lie down. After she complied, he replaced the gag.

Stutzman momentarily left the room and returned with a knife and a bagful of clothing. He cut the ropes off her, removed the blindfold and gag, and directed her to put on stockings, a skirt, and some shirts. He then directed her to go to the bathroom where he put the blindfold back on her, tied her hands together above the shower rail, and cut off her skirt and shirt with the knife. Over the course of six hours, with a few breaks so she could attend to her nephew, he continued a pattern of making her change clothes, tying her up in different positions or places, and then cutting or ripping the clothes off. At one point while she was completely bound, he made her bend over a chair and he put a knife to her throat while he rubbed her back, legs, and bottom with his erect penis. He tried to use a ball gag, but it would not fit into her mouth. He also covered her face with what looked like a muzzle and put a dog collar around her neck.

At another point, he tied her to a chair, put a knife to her throat, and said, "I hate when they cry," and began to touch the insides of her leg. He cut the ropes and told her to lie on the bed. He cut or ripped off the negligee he had made her wear and began rubbing her chest and stomach and kissing her neck and breasts. After about five minutes, he became upset and said, "I can't do this. I got to leave." They both dressed

13

and he gathered up his things and some of hers.  Before he left, he asked her if she was going to tell her brother.  She told him she was not going to tell her brother or call the police.  He apologized, shook her hand and told her he would call her brother later that evening.  After crying for 10 minutes, she called her brother and told him to come home.  Then she went to work, told her friends what happened, and eventually called the police.

*Defense Evidence*

A psychiatrist testified regarding methamphetamine use and its effects on the brain.  These effects include psychosis, visual distortions, distortion of reality and sense of time, and suggestibility.  Laboratory results showed a relatively low level of methamphetamine in Stutzman's blood stream, although the amount at the time of ingestion would have been high enough to cause amphetamine intoxication.  The results showed a higher level of methamphetamine in Kimberly's bloodstream.  She also had marijuana in her bloodstream.  Nicole had a significantly higher level of methamphetamine in her system, indicating a greater amount of drug abuse.  Nicole also had marijuana and cocaine in her system.  All three drugs will alter a person's perception of reality and abused together could have an additive or even magnifying effect.  Someone under the influence of drugs, alcohol, or a combination of drugs is more likely to have perception errors than a person who is not under the influence.

Nicole's former boyfriend testified Nicole lied and cheated during their relationship.  She also falsely accused him of pushing her against the wall, which caused him to spend a week in jail.  On another occasion, she attacked him and called the police,

14

which resulted in his arrest. After they broke up, she threatened to call the police and say he pushed her down the stairs.

Several witnesses testified as to Stutzman's good character. Stutzman also testified in his own defense. He admitted using drugs with Nicole and Kimberly and claimed any sexual activity was consensual. He said they tied him up first and he admitted tying them up, too, but claimed it was brief and part of a consensual role-playing sex game. The women both tried on different clothing, which he cut off as part of the role-playing. His threats to the women were also part of the role-playing. He stated Nicole attempted to orally copulate him, but he was unable to achieve an erection. After awhile, Nicole uttered something, which included the word "rape" and ran out the door. Surprised, he asked Kimberly, "Was that for real?" Then, fearing repercussions if the police arrived, he packed some items and left with Kimberly, who went with him voluntarily.

*Rebuttal Evidence*

A sheriff's detective interviewed Stutzman after the incident. During the interview, Stutzman's memory of certain parts of the incident was "vague." He had no memory of the oral sex or intercourse that occurred. He explained he was intoxicated during the incident. He also admitted Kimberly was crying when she was in the car with him.

15

DISCUSSION

I

*Dismissal of Juror*

A

After the jury had deliberated a little over a day, the court received a note from four jurors asking: "If a juror expresses that they have reached a conclusion before deliberation on one or more counts/allegations, are they violating the duty to deliberate to the degree that they need to remove themselves or be removed from the process[?]" At the same time, Juror No. 3 submitted a note asking: "Once a charge slip is written and remains in the jurors room as to guilt or not guilt can the slip be changed to be guilt or not guilt[?]" (Some capitalization omitted.)

Outside the presence of the other jurors, the court and counsel spoke to Juror No. 5, the foreperson, about the note. Juror No. 5 stated Juror No. 3 "made several comments yesterday that his mind was made up that there's nothing that we could talk about that would change his mind. He had already made his decision." This led to "some argumentative talk" about the rules of deliberation and the need to listen and keep an open mind, but Juror No. 3 "came back today and he—he won't say he's made up his mind on all 14 counts, but he says he wants to change all his choices that he's decided on so far."

When the court suggested it appeared Juror No. 3 was continuing to deliberate, Juror No. 5 disagreed, explaining Juror No. 3 was "saying that he was forced yesterday to make decisions he felt pressured and that he feels in his mind he's already made his

16

decision on all counts." Juror No. 5 further explained the other jurors felt Juror No. 3

"won't listen to us" and he was "not following the protocol in the book." He believed

Juror No. 3 had "preconceived what his decisions were." Juror No. 5 elaborated,

"[Y]esterday, we went through the process. There's a one, two, three, four, we're

following a process. He answered those four questions which would lead [to] a verdict

one way or the other. After he saw where the verdict was going, he's like, 'No, I change

my mind.' Even though that in his mind he already knows what everything is going to

be."

        The following colloquy then occurred:

> "THE COURT: But what I'm getting is that the juror said, okay, I
> made up my mind[.] I listened to the evidence[.] I've come to the
> jury room I think the verdict ought to be this. And then he heard
> other jurors say other things and then he said, you know what,
> maybe my verdict out [sic] to be the other thing.
>
> "THE FOREPERSON: No, that's not how it was.
>
> "THE COURT: Okay. How was it then?
>
> "THE FOREPERSON: Yesterday he came in, his mind set, this is
> how it's going to be and I don't care what you guys say, I don't care
> what facts you have, I've already made up my mind. I sat in there
> and this is my decision. And then we're like, well, that's not what
> deliberation is. When you go in there, you need to come with an
> open mind, you can have feelings one way or the other but just listen
> to the evidence and listen to the facts and then you can decide for
> yourself either way. We're completely open. But he's not. He's not
> listening. Like he's predetermined already on everything. Like no
> matter, we go one way or the other way, there's—He's already made
> up his mind and he's stated that. There's two other people there that
> heard him state facts that heard that he came already predetermined.
>
> "THE COURT: Again, he came predetermined to vote one way
> yesterday and today his vote—

17

"THE FOREPERSON: No. His vote was kind of that way the other day and then he felt we pressured him. He said he couldn't sleep because he felt pressured and now wants to change his decisions.

"THE COURT: Isn't that deliberating?

"[DEFENSE COUNSEL]: [¶] . . . [¶] Sounds to me like what you're saying is that he came in with these preconceived notions, had a discussion about what deliberation is. He said, let's go through these four points, he kind of agreed with those four points, and came to a conclusion that's different than his preconceived ideas and now he's upset by that?

"THE FOREPERSON: Yes.

[¶] . . . [¶]

"[PROSECUTOR]: Did he express at the beginning of the outset, before deliberations, some type of opinion? Again, don't tell me what way. Did he express that before there were deliberations?

"THE FOREPERSON: Yes. When we started deliberation—I won't say—we just all felt like we needed—we sat here for two weeks, we just need to talk. So everyone had a chance to go around the table and say whatever they wanted. I believe at that point that could have been that he stated something similar to that.

"[PROSECUTOR]: And by 'something similar to that,' do you mean, again, the whole time? We don't want to hear which way.

"THE FOREPERSON: I know.

"[PROSECUTOR]: Something that he stated at the beginning, did that indicate to you a—expressing a fixed conclusion at that time?

"THE FOREPERSON: Yes, yes.

"[PROSECUTOR]: Okay. And then there was some discussions, was there agreements reached or verdicts reached on some counts at some point?

"THE FOREPERSON: Yes.

18

"[PROSECUTOR]:  And then that was yesterday?

[¶] . . . [¶]

"THE FOREPERSON:  Yes.

[¶] . . . [¶]

"[PROSECUTOR]:  And then today, came in and expressed wanting to go back to what the fixed position he had indicated at the outset of the deliberations?

"THE FOREPERSON:  Yes.

"[PROSECUTION]:  Was there any discussion that contributed to that or—

"THE FOREPERSON:  No.

"[PROSECUTION]:  Why do you say no?

"THE FOREPERSON:  . . . [W]hen we came in this morning, he was the first one to speak.  So nobody had spoken or deliberated at all.

[¶] . . . [¶]

"[PROSECUTION]:  Did he, either yesterday or today, express a refusal to consider other points?

"THE FOREPERSON:  Yes.  And it was stated, three people for sure heard it.

"THE COURT:  Was there a particular juror that he had any kind of a confrontation with about not deliberating?

"THE FOREPERSON:  No.

"THE COURT:  Okay.

"THE FOREPERSON:  It was mainly around the table, not everyone agreed but most everybody agreed."

19

The court then spoke with Juror No. 12, who indicated Juror No. 3 made it "very clear" the previous day his mind was made up and he was not going to change his mind. After the jurors quoted the instructions and discussed the need to "go through everything," Juror No. 3 returned from lunch and deliberated "a little bit or at least he changed his mind" and the jury made a few decisions. That morning, however, Juror No. 3 stated he wanted to change the previous day's decisions and "he's already made his mind up and that he, you know, isn't really going to bend that much on it." He did not try to state why he held his opinions or convince anyone else to be on his side. He declined to explain the basis of his opinion stating, "I don't need to, I heard the testimony." He gave his conclusions, but not the reasons why he came to them. According to Juror No. 12, "[f]or a moment in time" after lunch the previous day, Juror No. 3 was "close" to being willing to consider other points of view. However, as of that morning, Juror No. 3 was not considering other points of view and stated, "I've made my mind up and this is how I'm going to stand on things." He also stated, "hung jur[ie]s happen all the time, it's not a big deal, it's okay if it happens." According to Juror No. 12, there were jurors holding very strong on both sides, but yesterday they had talked through and come to agreement on some things. That day, however, no deliberations had occurred because Juror No. 3, made it clear he was not going to bend.

The following colloquy then occurred between Juror No. 12 and the prosecutor:

> "[PROSECUTOR]: I'm trying to distinguish between whether or not he'll change his conclusion, is one thing, whether he's open to discussing [it] with other jurors, listening to points of view or giving his own, whether he's willing to or not willing to.

20

"JUROR NUMBER 12:  I don't think he's willing to give his point of view, other than, this is my decision.  I don't think he's willing to back it up with, here's the information we received and this is why I believe this way.  He's just going, I heard it and so I believe it and this is where we're going to go.  Which really isn't deliberating.

"[PROSECUTOR]:  Was he willing to discuss other people's points of view or did he just not participate when they were discussing their points of view after this morning[']s—

"JUROR NUMBER 12:  The closest thing that I could say, in the discussions, he mumbles, 'Oh, that's a whole bunch of crap.'  That's the closest I can say that he discusses."

The court and counsel then spoke to Juror No. 3.  He stated, he "love[d] deliberating" and was "willing to formulate arguments either for or against, if they are in a context of a listening environment[,] and an environment [of] conviviality and non-conjecture."  He said some of his points had been rebutted by the other jurors and there was "an early-on sense of indifference that is uncomfortable."

When the court asked if he was willing to share his ideas about the evidence, Juror No. 3 stated, "I can sit and listen to their view points on the evidence."  When asked whether he was willing to tell the other jurors his views and why he reached them, he said he already had.  He also said he thought he had "stated enough of my view for them to be comfortable accepting my views as my views and their views are their views and my views are mine.  It's okay to be incomplete on all of them, we're given that right to be incomplete."

When the court asked once again whether he was willing to share his ideas about the evidence, the witnesses, and the trial with the other jurors, he stated, "There's a thick

21

air about it and it would make some of that difficult to—a timely egress through that would be hard on both sides at this point." Nonetheless, he stated he was willing to do it if the court directed him to do so.

When the court asked yet again if he would be willing to explain his view if one of the jurors wanted to know why he thought a certain way, he responded, "Not when there's an air of ambiguity and finger pointing an honest of conjecture as to my difference to their points."

The court then asked whether it would be fair to say he was through explaining his positions. The court clarified he did not have to change his mind. Rather, he needed to be willing to continue engaging in dialog by both giving his ideas and listening to the other jurors' ideas. Juror No. 3 responded that he had expressed his views "enough," he felt a "cold sense of unacceptability" from the other jurors and they were at an "impasse."

The following exchange then occurred:

"THE COURT: Here's kind of where I think we are. You're telling me you listened to the evidence, you used your judgment, and you kind of made decisions on everything.

"JUROR NUMBER 3: That was brought out that we were discussing, not anything else.

"THE COURT: But my question is, it's the same question: [¶] Whether or not you're still willing to talk to the other jurors about why you support your positions and listen to the reasons why they support their positions?

"JUROR NUMBER 3: I stated that over and over and over and over, and that's where were at now with how I've stated that. I've stated that in four or five different ways of the same thing. I mean, I'm not inarticulate to where I can't express my emotional view points or my verbal view points or any view points in a manner that's

22

discernible at all. [¶] And so, like I said earlier, I think it's reached a point of mutuality, in a sense.

"THE COURT: Do you think additional deliberations would be of no value?

"JUROR NUMBER 3: Yeah. If they can't accept and need more discussion, I feel I've already discussed enough.

"THE COURT: How about the opposite of discussing, how about listening? Have you listened enough or are you willing to listen some more?

"JUROR NUMBER 3: I've listened quite attentively throughout the whole trial.

"THE COURT: No, I understand that.

"JUROR NUMBER 3: And in the deliberation room.

"THE COURT: Are you willing to listen some more?

"JUROR NUMBER 3: If it's just about me wanting to, hell no, to be frank. You know, I can care less whether I see some of the people or not for the rest of my life.

"THE COURT: Here's what I have to decide, we spent two weeks doing this so far—

"JUROR NUMBER 3: I understand.

"THE COURT: —and I have to decide what to do. And so you're right now, you're the key to that.

"JUROR NUMBER 3: Yeah. Hard as that is to accept, I realize full well.

"THE COURT: Normally, I send everybody back in the jury room and say, 'Give it some more time, it's only been a day, go back and talk some more see what happens.' [¶] So my question to you: [¶] [W]ould that be a complete waste of time to send all of you back in there?

23

"JUROR NUMBER 3: That's where they're at and I can go home and sleep well tonight, if that's the case now. But you need a direct answer on me from that point and I'm conflicted. I want to but I don't want to, just the same.

"THE COURT: I can understand not wanting to, but are you willing to go back and talk for another period of time? Talk and listen.

"JUROR NUMBER 3: Talk and listen. I got a—I have everybody's voice in my head right now as to what I presume to be the points of interest and—

"THE COURT: Sounds like you really don't want to hear more.

"JUROR NUMBER 3: I really don't as it washes out and pans out. I really don't.

"THE COURT: You really think you've already told them your opinions and you don't want to tell them any more?

"JUROR NUMBER 3: I'm comfortable with that and they're comfortable with me with that. And—

"THE COURT: Okay.

"JUROR NUMBER 3: —I'm comfortable with them, with their's also. I don't have any ambiguity that way either.

"THE COURT: So pretty much you're through talking and through listening?

"JUROR NUMBER 3: On the points—on the points that we've discussed. If there's new points and like if these are done and through and we're moving on, on new points, I'm willing to discuss new points. [¶] You know, but if they want to rehash these old talid and rattled pangs of clonging bells, then I don't want to be there." (Spelling and punctuation errors in original.)

The court then permitted counsel to question Juror No. 3. Defense counsel began the questioning and when he informed Juror No. 3, the other jurors indicated Juror No. 3 had made his mind up prior to deliberations, Juror No. 3 responded, "That was a

24

misconstrued breach."  He said he felt compelled to go against his beliefs, then went home and thought about it and returned that day and expressed his position.  He felt his integrity was being "held to task."

When questioned by the prosecutor, he indicated they were "not even close" to going through the 14 different counts and allegations.  He also stated he felt disrespected by the other jurors.  In response to the prosecutor's comment that it appeared he did not want to continue deliberations, Juror No. 3 acknowledged, "it would be hard under the air of what it is now."  When the prosecutor asked him specifically whether, in light of the difficulties he articulated, he could go back into the jury room and continue deliberating, he responded, "Okay.  If it would make it easier, like I said earlier, I would rather not."  The following exchange then occurred:

> "[PROSECUTOR]:  You would rather not be on this jury?
>
> "JUROR NUMBER 3:  I would rather discontinue, yes, sir.  I've been on a trial, it was a civil trial about 10 years back and lasted up—it was about a solid 6 weeks.  So it's not like I haven't done this before and I haven't been willing to listen to God-awful boring tax information.  We deliberated, I think it was about four days solid or more, that's an—that was about four days.  [¶]  So I've been through the process of a marathon in regards to the judicial system and facilitation and what I'm obligated and admonished to do.  [¶]  And so with this being as it is now, this particular trial being as it is now, and the—just the feeling of the air of disdain is difficult.
>
> "[PROSECUTOR]:  Let me put it to you this way, not wanting to know where you stand, one side or the other, can you, from this point forward, not saying you've start fresh, you don't.  You've had deliberation, I understand that.  But there's potentially more discussions to be had about the different counts and allegations.  Can you—

25

"[JUROR NUMBER 3]: I can't trust that they wouldn't continually go back to this.

"[PROSECUTOR]: Can you in fairness to both sides equally fair to the People and the defense, go back there and discuss with those other jurors the remaining things to be discussed and listening fully and also articulating your points of view fully?

"[JUROR NUMBER 3]: I'm human and I tend to close out after a period of time when there's inability to—inability to communicate.

"[PROSECUTOR]: I don't want to put words in your mouth, would it be fair to say you're essentially saying, hey, I'm done?

"[JUROR NUMBER 3]: As I've said before twice, I believe, yes, I do believe that in my heart."

The court then stated it needed to decide whether Juror No. 3 was willing to continue to deliberate. Juror No. 3 responded, "No I do not want to deliberate anymore on this particular case." He subsequently clarified he was also unwilling to deliberate further.

After the court concluded its questioning and Juror No. 3 left the courtroom, the prosecutor asked the court to excuse Juror No. 3. Defense counsel discussed the matter with Stutzman for several minutes and then acknowledged the juror's confirmation he would not deliberate "ties the court's hands." Defense counsel stated he understood why the court would want to dismiss the juror and said, "I think we can live with that." When the court asked defense counsel if he wanted to take a position on the record regarding whether the juror should be excused, defense counsel stated, "We can let him go." The court subsequently excused Juror No. 3 and replaced him with an alternate.

26

B

Stutzman contends the court improperly discharged Juror No. 3. More particularly, he contends the court erred when it permitted the prosecutor to question Juror No. 3 "in a manner which caused the juror to conclude his further participation in deliberations was not expedient and he did not want to deliberate further, thereby necessitating his discharge." He also contends the court's inquiry initially showed there was no demonstrable reality Juror No. 3 refused to deliberate and, consequently, the court abused its discretion by permitting further inquiry by counsel. We are not persuaded by these contentions.

"Section 1089 provides that a trial court may dismiss a juror and replace him or her with an alternate if it finds the juror is unable to perform his or her duty. The court properly may dismiss a juror based on the juror's 'unwillingness to engage in the deliberative process.' [Citation.] A juror who expresses a fixed conclusion at the start of deliberations and rebuffs attempts to engage him or her in the discussion of other points of view raised by other jurors has refused to deliberate, and properly may be discharged. On the other hand, '[t]he circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge.' " (*People v. Alexander* (2010) 49 Cal.4th 846, 926.)

27

"The trial court's authority to discharge a juror includes the authority to conduct an appropriate investigation concerning whether there is good cause to do so, and the authority to take 'less drastic steps [than discharge] where appropriate to deter any misconduct or misunderstanding it has reason to suspect.' [Citation.] As [the California Supreme Court has] stated, 'a trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations. Additionally, the inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists.' [Citation.] Nonetheless, the need to protect sanctity of the deliberations does not mean that any inquiry into the deliberation process violates the defendant's constitutional or statutory rights: 'secrecy *may* give way to reasonable inquiry by the court when it receives an allegation that a deliberating juror has committed misconduct.' [Citations.] On appeal, we review for abuse of discretion the trial court's decisions concerning whether and how to investigate the possibility that a juror should be discharged for failure to perform his or her duties, and whether, ultimately, to discharge the juror or to take some other action." (*People v. Alexander*, *supra*, 49 Cal.4th at pp. 926-927.)

"While removal of a juror is committed to the discretion of the trial court, upon review, the juror's disqualification must appear on the record as a demonstrable reality. 'The demonstrable reality test entails a more comprehensive and less deferential review'

28

than substantial evidence review. 'It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [the ground for removal] was established. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' " (*People v. Homick* (2012) 55 Cal.4th 816, 899.)

In this case, there is ample evidence to support the court's finding Juror No. 3 refused to deliberate. According to both Juror No. 5 and Juror No. 12, Juror No. 3 expressed a fixed conclusion at the outset of deliberations and would not consider other viewpoints. He also would not explain his positions or discuss their bases. (See *People v. Barnwell* (2007) 41 Cal.4th 1038, 1051 [grounds for removal of a juror may be established by the testimony of other jurors].) Although Juror No. 3 disputed these points and claimed he loved deliberation, he also stated he had expressed his views enough, he did not want to continue talking and listening to the other jurors, and he did not think additional deliberations would be helpful. Then, when the court asked him point blank whether he was willing to continue deliberating, he responded with an unequivocal "no." As defense counsel acknowledged below, this response effectively tied the court's hand.

Stutzman suggests, however, Juror No. 3 did not mean what he said and instead asserts the prosecutor "used his legal legerdemain to lead Juror No. 3 down the path to the exit door." He also criticizes the court's decision to allow counsel to question Juror No. 3, noting the California Supreme Court has advised "permitting the attorneys for the

29

parties to question deliberating jurors is fraught with peril and generally should not be permitted." (*People v. Cleveland* (2001) 25 Cal.4th 466, 485.) While we do not question the Supreme Court's wisdom on this point, we note the court allowed counsel to ask clarifying questions in this case because it knew the dismissal of the juror would be a potential appellate issue and it wanted to be fair to both parties as well as make a good record for our review. In addition, both counsel were extremely careful in their questioning. They did not elicit any information about the jury's leanings and framed their questions using nonjudgmental language. Moreover, the record belies Stutzman's assertion the prosecutor duped Juror No. 3 into expressing unwillingness to deliberate further. By the time the prosecutor questioned him on this point, he had by his own characterization previously expressed his unwillingness to the court multiple times. He went on to express it to the court twice more after the prosecutor's questioning. Accordingly, we conclude Stutzman has not shown the court abused its discretion by dismissing Juror No. 3.

Given our conclusion, we need not address the People's argument Stutzman waived any challenge to Juror No. 3's dismissal by consenting to it. We also need not address Stutzman's corresponding ineffective assistance of trial counsel argument.

## II

### *Sufficiency of Carjacking Evidence*

" 'Carjacking' is the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence, . . . against his or her will and with the intent to either permanently or temporarily deprive the person in possession of

30

the motor vehicle of his or her possession, accomplished by means of force or fear." (§ 215, subd. (a).) "A conviction for carjacking requires proof that (1) the defendant took a vehicle that was not his or hers (2) from the immediate presence of a person who possessed the vehicle or was a passenger in the vehicle (3) against that person's will (4) by using force or fear and (5) with the intent of temporarily or permanently depriving the person of possession of the vehicle." (*People v. Magallanes* (2009) 173 Cal.App.4th 529, 534.)

Stutzman contends we must reverse his carjacking conviction because there was insufficient evidence he took a vehicle by force or fear within the immediate presence of a person with a possessory interest in the vehicle. We disagree.

"When a conviction is challenged for lack of evidentiary support, we 'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] If the circumstances reasonably justify the trial court's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.] The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact; it is not whether guilt is established beyond a reasonable doubt.' " (*People v. Gray* (1998) 66 Cal.App.4th 973, 983-984.)

Here, the evidence viewed in the light most favorable to the judgment showed Stutzman took the keys to Nicole's car from Kimberly while holding a knife to Kimberly's side. Until then, Kimberly had been using the car with Nicole's permission to take Stutzman on errands to purchase drugs. After Stutzman obtained the keys, he took

31

Kimberly back to his apartment where he sexually assaulted her and Nicole. When Nicole escaped, Stutzman took Kimberly back to the car and made her drive him away from the apartment complex under threat of death. When Stutzman decided to release Kimberly, she asked him to give the car back to her. He laughed in response and retained possession of it. A jury could reasonably infer from this evidence that Kimberly had possession of Nicole's car, Stutzman took the car from Kimberly's immediate presence against her will using force or fear, and he intended to temporarily or permanently deprive her of its possession. Thus, we conclude there is sufficient evidence in the record to support Stutzman's carjacking conviction.

The fact the prosecutor did not reference the events at Stutzman's workplace in his closing arguments to the jury on the carjacking charge does not alter our conclusion. Stutzman has not cited any authority limiting our review solely to evidence argued by the prosecutor. Moreover, such a rule would be contrary to well-established rules requiring us, when conducting a substantial evidence review, to consider the *whole record* and to uphold the judgment " 'unless it appears "that upon *no hypothesis whatever* is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508, italics added; see *People v. Beaver* (2010) 186 Cal.App.4th 107, 114 [when conducting a substantial evidence review, appellate courts review the entire record, not isolated bits].)

The decision in *People v. Coleman* (2007) 146 Cal.App.4th 1363 does not alter our conclusion. In that case, the defendant entered a store and forced a store employee to give him the keys to the store owner's personal vehicle. (*Id*. at p. 1366.) The appellate

32

court concluded the requirements for a carjacking conviction had not been met because the store employee "was not within any physical proximity to the [vehicle], the keys she relinquished were not her own, and there was no evidence that she had ever been or would be a driver of or passenger in the [vehicle]." (*Id*. at p. 1373.) In other words, while the evidence showed the defendant took the vehicle from someone's immediate presence, it did not show, as here, that the defendant took the vehicle from the immediate presence of a person who possessed it within the meaning of section 215, subdivision (a).

## III

### *Admission of Propensity Evidence*

### A

Before trial, the prosecutor moved to admit evidence of Stutzman's prior sexual offense against Jennifer under Evidence Code sections 1101, subdivision (b), and 1108, subdivision (a).[9] The court granted the motion over defense counsel's assertion the court should exclude the evidence under Evidence Code section 352.

---

[9] Evidence Code section 1101, subdivision (b), provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

Evidence Code section 1108, subdivision (a), provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code section] 1101, if the evidence is not inadmissible pursuant to [Evidence Code section] 352."

B

Solely to preserve a federal claim of error, Stutzman contends the trial court erred in admitting the evidence under Evidence Code section 1108, subdivision (a), because the statute violates due process. He acknowledges the California Supreme Court has decided to the contrary. (*People v. Loy* (2011) 52 Cal.4th 46, 60-61 (*Loy*); *People v. Falsetta* (1999) 21 Cal.4th 903, 922.) He also acknowledges we are bound by Supreme Court authority. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

C

Stutzman also contends the court erred by not excluding the evidence under Evidence Code section 352. Evidence Code section 352 "gives the trial court discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue time consumption or create substantial danger of undue prejudice, confusing the issues, or misleading the jury. In exercising this discretion as to a sexual offense, 'trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.' " (*Loy, supra*, 52 Cal.4th at p. 61.) We review the court's ruling for abuse of discretion. (*Ibid.*)

34

Stutzman's conviction for the crime against Jennifer strongly supported admission of the evidence because he "bore no new burden of defending against the [crime]," the jury would not be tempted to punish him for the crime by finding him guilty of the charges in this case, and "there was little danger of confusing the issues or requiring an inefficient minitrial to determine [his] guilt" of the crime." (*Loy*, *supra*, 52 Cal.4th at p. 61).

In addition, the evidence did not distract the jury from its main inquiry. (*Loy*, *supra*, 52 Cal.4th at p. 61.) "The Legislature has determined that [prior sexual offense] evidence is ' "particularly probative" ' in sex cases." (*Ibid.*) The main inquiry in this case was whether Nicole and Kimberly consented to the sexual activity. The evidence of Stutzman's prior crime against Jennifer assisted in this inquiry, particularly given the striking similarity between the two cases.

Although criminal history evidence "inevitably has some prejudicial effect," this circumstance is not sufficient to exclude it. (*Loy*, *supra*, 52 Cal.4th at p. 62.) " '[Evidence Code] section 1108 affects the practical operation of [Evidence Code] section 352 balancing " 'because admission and consideration of evidence of other sexual offenses to show character or disposition would be no longer treated as intrinsically prejudicial or impermissible. Hence, evidence offered under [Evidence Code section] 1108 could not be excluded on the basis of [Evidence Code section] 352 unless "the probability that its admission will . . . create substantial danger of undue prejudice" . . . substantially outweighed its probative value concerning the defendant's disposition to commit the sexual offense or offenses with which he is charged and other

35

matters relevant to the determination of the charge.  As with other forms of relevant evidence that are not subject to any exclusionary principle, *the presumption will be in favor of admission*.' " ' " (*Loy*, at p. 62.)

Nothing about the evidence of Stutzman's prior crime required the court to find this presumption was overcome.  The facts of the prior crime were not particularly inflammatory compared to the crimes in this case, the evidence was presented quickly through the testimony of a single witness and the prior crime was not too remote to be probative.  (*Loy*, *supra*, 52 Cal.4th at p. 62.)  Accordingly, we conclude Stutzman has not established the court abused its discretion by not excluding the evidence under Evidence Code section 352.

DISPOSITION

The judgment is affirmed.

MCCONNELL, P. J.

WE CONCUR:

HALLER, J.

MCDONALD, J.

36